995 F.2d 425
 1993-1 Trade Cases P 70,228
 GULFSTREAM III ASSOCIATES, INC., Gulfstream IV Associates, Inc.
v.
GULFSTREAM AEROSPACE CORPORATION, a Delaware Corp.;
Gulfstream Aerospace Corporation, a Georgia Corp.;
Gulfstream American Corporation; Atlantic Aviation
Corporation; Cessna Aircraft Company; Gates Learjet
Corporation; British Aerospace, Inc.; Canadair Challenger,
Inc.; Mitsubishi Aircraft International Inc.
Cessna Aircraft Company Appellant in No. 91-5932.
Gulfstream III Associates Inc., Gulfstream IV Associates,
Inc., Appellants in No. 91-5965.
 Nos. 91-5932, 91-5965.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 3, 1992.
Decided May 18, 1993.
 
 Arthur R. Schmauder (argued), Raymond M. Tierney, Jr., Francis B. Sheehan, Sheila G. Gruber, Shanley & Fisher, P.C., Morristown, NJ, for Cessna Aircraft Co., appellant in No. 91-5932, appellee in No. 91-5965.
 Joanne Zack (argued), Harold E. Kohn, Robert J. LaRocca, Deborah A. Sottosanti, Kohn, Nast & Graf, P.C., Philadelphia, PA, Michael S. Waters, Carpenter, Bennett & Morrissey, Newark, NJ, for Gulfstream III Associates, and Gulfstream IV Associates, appellants in No. 91-5965, appellees in No. 91-5932.
 Before: SLOVITER, Chief Judge, GREENBERG and SEITZ, Circuit Judges.
 OPINION OF THE COURT Except as to Part II(A)(1)(c)
 SEITZ, Circuit Judge.
 
 
 1
 Gulfstream III Associates, Inc. ("plaintiff"), instituted this antitrust action against seven manufacturers of business jet aircraft. It charged a horizontal price-fixing conspiracy among these manufacturers to fix, raise and stabilize the prices of new business jets in the United States, including those plaintiff agreed to purchase.
 
 
 2
 Six of the manufacturers settled. The seventh, Cessna Aircraft Company ("defendant") resisted the three claims asserted against it. The district court granted summary judgment to defendant on two of the three claims arising out of agreements to purchase aircraft. One of these claims, that of Gulfstream IV Associates, Inc., was abandoned on appeal. The judgments of the district court on plaintiff's two claims form the bases for these appeals. In resolving these issues, with one exception later addressed, neither party raises any objection to the fact that the district court decided all issues on a paper record.
 
 I. BACKGROUND
 
 3
 Plaintiff's first claim against defendant arose out of an agreement made on March 25, 1983, under which plaintiff agreed to purchase a Gulfstream Model IV aircraft ("G-IV") from a settling codefendant, Gulfstream Aerospace Corporation ("GAC"), for $13,470,000. Subsequently, plaintiff settled its antitrust claims against GAC. Under the terms of the settlement with GAC, plaintiff transferred all of its rights in the G-IV Purchase Agreement back to GAC. The district court granted summary judgment for defendant after concluding that "plaintiff[ ] could have suffered no overcharge or consequential damages on a contract which was canceled." (J.A. at 35).
 
 
 4
 Plaintiff's second claim against defendant arose out of an agreement made in September 1981, under which plaintiff agreed to purchase a Gulfstream Model III aircraft ("G-III") from GAC for $9,975,000, subject to a price escalation clause. After the district court denied defendant's motion for summary judgment on the second claim, the claim went to trial and the jury returned a verdict for plaintiff which, when trebled, amounted to $2,992,500.
 
 
 5
 Thereafter, defendant moved for a judgment dismissing the second claim or, in the alternative, for a declaration that plaintiff was entitled to no damages. The district court found that plaintiff had received from pretrial settlements with codefendants an aggregate sum greater than treble the amount awarded by the jury in this action. As a result, although it did not dismiss the complaint, it reduced the verdict to zero and entered final judgment for defendant. However, it subsequently granted plaintiff attorneys' fees.
 
 
 6
 Despite the fact that defendant was the beneficiary of the judgment on the second claim, it filed a notice of appeal from the judgment except to the extent it ordered that plaintiff was entitled to no damages (No. 91-5932). The appeal asserts that its pretrial motion for summary judgment should have been granted. Thus, its appeal is taken to negate the jury verdict and the possible collateral consequence flowing therefrom, viz., the allowance of attorneys' fees. Thereafter, plaintiff filed an appeal attacking the final judgment of the district court as well as the denial of its motion to amend the judgment (No. 91-5965).
 
 
 7
 Both sides later appealed the award of attorneys' fees (No. 92-5263 and No. 92-5273). Those appeals are decided in a separate opinion filed this day.
 
 
 8
 The district court had jurisdiction over this action under the federal antitrust laws pursuant to 28 U.S.C. § 1337(a) and 15 U.S.C. § 15(a). This court has jurisdiction over the appeals from the final judgment of the district court pursuant to 28 U.S.C. § 1291.II. DISCUSSION
 
 A. Defendant's Appeal
 
 9
 We turn first to defendant's limited appeal of the judgment in its favor on the second claim. We do so because the attacks on plaintiff's standing, if cognizable and meritorious, would result in a determination that defendant should have been granted pretrial judgment, thus vitiating the jury's verdict for plaintiff.
 
 
 10
 Plaintiff does not assert that defendant lacks standing to appeal the judgment because it was entered in defendant's favor. In any event, we conclude that defendant has such standing because it "retains a stake in the appeal satisfying the requirements of Art. III," viz., the allowance of attorneys' fees. Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 334, 100 S.Ct. 1166, 1172, 63 L.Ed.2d 427 (1980). We turn then to defendant's appeal mindful that these threshold issues were decided against defendant pretrial by the district court.
 
 1. Plaintiff's Antitrust Standing
 
 11
 We understand defendant's appeal on these standing-related issues to be limited to the district court's denial of defendant's motion for summary judgment. Our standard of review is plenary. See Schafer v. Board of Pub. Educ. of Sch. Dist. of Pittsburgh, Pa., 903 F.2d 243, 246 (3d Cir.1990) ("Our review of the district court's order ... denying appellant's summary judgment motion is plenary.").
 
 
 12
 Before addressing defendant's specific attacks on plaintiff's standing, some exposition of the law of antitrust standing is in order. "[T]he focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine. Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." Associated Gen. Contractors v. California State Council of Carpenters, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983) (emphasis added). Whether a plaintiff is the "proper party" involves considerations of "doctrines such as foreseeability and proximate cause, directness of injury, certainty of damages and privity of contract." Id. at 532-33, 103 S.Ct. at 905 (footnotes omitted).
 
 
 13
 In Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Supreme Court set forth a two-part test for antitrust standing that has recently been applied by our court. See International Raw Materials, Ltd. v. Stauffer Chem. Co., 978 F.2d 1318, 1327-28 (3d Cir.1992). To establish antitrust standing a plaintiff must show both: 1) harm of the type the antitrust laws were intended to prevent; and 2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful. Id.
 
 
 14
 Based on the pretrial record, the first requirement is easily satisfied. The "decreased competition" in the business jet market is "the type of harm targeted by the antitrust laws." Id. at 1328. The second requirement is generally met if the plaintiff is a "competitor [ ]or a consumer in the relevant market." Id. Alternatively, this requirement is fulfilled if there exists a "significant causal connection" such that the harm to the plaintiff can be said to be "inextricably intertwined" with the antitrust conspiracy. Id. (quoting Blue Shield v. McCready, 457 U.S. 465, 484, 102 S.Ct. 2540, 2551, 73 L.Ed.2d 149 (1982)).
 
 
 15
 As to the second requirement, plaintiff was either a consumer or a competitor, or both, in the relevant market.[1] In addition, the harm to plaintiff through lost profits (or increased losses) on the G-III Purchase Agreement was inextricably intertwined with the horizontal price fixing conspiracy. Thus, unless certain other issues raised by defendant negate plaintiff's standing, defendant was not entitled to summary judgment based on lack of standing. We turn to those issues.
 
 
 16
 a. Proximate Causation
 
 
 17
 Antitrust standing requires proximate causation between defendant's conduct and the injury to plaintiff. See Associated Gen. Contractors, 459 U.S. at 535-37, 103 S.Ct. at 907-08. Defendant asserts that plaintiff lacks standing to bring the G-III claim because defendant's antitrust violation was not the proximate cause of the injury to plaintiff. It says that, on the contrary, the proximate cause of plaintiff's injury was its inability to find a lessee for the G-III.
 
 
 18
 The defendant's argument is without merit even though the record shows that plaintiff contemplated taking title to the G-III only if it could find a lessee. Plaintiff's financing for the G-III Purchase Agreement was conditioned by plaintiff's bank upon plaintiff's doing one of two things when the plane was ready for delivery; either: 1) selling the plane/purchase agreement to a third party; or 2) entering into an agreement to lease the plane to a third party and then taking title to the plane. Under either of these options, the defendant's antitrust violation (which caused an overcharge in purchase price) would have been the proximate cause of plaintiff's injury. Under the first option plaintiff would suffer the injury because the amount of the overcharge would reduce plaintiff's profits (or increase plaintiff's losses) from the sale of the plane/purchase agreement. Under the second option, plaintiff would suffer injury because plaintiff would pay the full purchase price (including the overcharge) before taking title to the plane.
 
 
 19
 In sum, defendant's antitrust violation caused an overcharge in the purchase price of the plane. That overcharge was incorporated into the purchase agreement signed by plaintiff. From the date plaintiff signed that agreement through the date the plane was delivered to a third party, subsequent to an assignment by plaintiff, it is not disputed that plaintiff remained obligated to pay the overcharge upon exercising either option. Thus, defendant's proximate cause argument did not entitle defendant to summary judgment.
 
 
 20
 b. "Purchase" of the G-III
 
 
 21
 Defendant next asserts that plaintiff lacks standing to bring the G-III claim because plaintiff assigned the agreement and thus never "purchased" the G-III. Defendant's argument seems to be predicated on the assumption that only a purchaser can have antitrust standing.
 
 
 22
 Almost fifty years ago, the Supreme Court rejected such an argument. See Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948) ("The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers.... The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." (emphasis added)). On their face, the antitrust laws purport to provide a remedy to "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws...." 15 U.S.C. § 15. Recent Supreme Court cases have espoused a narrower reading of the statutes' coverage. See, e.g., Associated Gen. Contractors, 459 U.S. at 529 & n. 19, 103 S.Ct. at 904 & n. 19 (quoting Mandeville; rejecting argument that "statute is as broad as its words suggest"). Nevertheless, the Supreme Court has never intimated that only purchasers have standing.
 
 
 23
 In addition, even if this court accepted the view that standing should generally be limited to purchasers, defendant's argument seeks to exalt form over substance. Admittedly, plaintiff assigned its rights in the plane and purchase agreement and never took title to the G-III. Thus, plaintiff was not a purchaser in the ordinary sense of that word. Nevertheless, plaintiff executed a purchase agreement and remained contractually bound to pay the G-III's total purchase price up to and including the date of delivery. We believe in these circumstances that plaintiff's continuing contractual obligation nullifies this objection to its standing and, thus, summary judgment was properly denied.c. Assignment of the G-III Purchase Agreement
 
 
 24
 Defendant next argues that plaintiff lacks standing to bring this action because it unconditionally assigned its antitrust rights in January of 1984 when it transferred its interest in the G-III and purchase agreement to JB & A Aircraft, Inc. Under the terms of that assignment, plaintiff "[sold], assign[ed], transfer[red] and set over ... all of its rights, title and interest in and to the [G-III] and the Purchase Agreement...." (J.A. at 356). This action was commenced against defendant in June of 1985, eighteen months after the assignment.
 
 
 25
 In a pretrial ruling, the district court recognized that antitrust claims are assignable, but rejected the argument that plaintiff had assigned its antitrust claim in this case. It contrasted this case with one previously decided by our court which involved, in part, an express assignment of antitrust rights and noted that no "language in plaintiff's assignment ... so much as allude[d] to rights under the antitrust laws." (J.A. at 58). The court stated: "On this record, the Court will not infer an assignment of plaintiff's Clayton Act rights." The defendant takes issue with that ruling.
 
 
 26
 Under controlling federal law, as the district court recognized, antitrust claims are assignable. In re Fine Paper Litig., 632 F.2d 1081, 1090 (3rd Cir.1980). The critical question is whether the general assignment here encompassed plaintiff's federal antitrust claim despite the fact that it is not specifically identified in the assignment that transferred all of plaintiff's interest in the G-III and the purchase agreement.
 
 
 27
 In its separate opinion, the majority of this court holds that federal rather than state law controls the issue as to whether there has been an assignment of an antitrust claim and that such law requires specific reference thereto in the assignment to transfer such claim. The author of this opinion is dubitante as to the majority determination because he believes that the case for the application of state law rather than federal "common law" may be more compelling and thus dictate a contrary conclusion. However, since the vote of the majority constitutes the holding of this court, it follows that there is no merit to defendant's argument that, because of the general assignment here, plaintiff lacked standing to maintain this antitrust action.
 
 
 28
 2. Refusal to Compel Production of Settlement Documents
 
 
 29
 In its brief on its cross appeal, defendant argues in a footnote that the "district court's refusal to permit Cessna access to the settlement agreements relied upon by the court in its summary judgment holding is reversible error."
 
 
 30
 The defendant's argument is not clearly discernible. We will therefore first interpret it to be an attack on the court's pretrial denial of defendant's motion for summary judgment. We understand such an argument to be premised on defendant's contention that the amount of the setoffs exceeded any reasonable potential verdict.
 
 
 31
 Even if one assumes that summary judgment would be appropriate in such a case, the short answer to this contention is that we cannot find in the record any application for the production of the settlement documents before the argument and decision on the summary judgment motion. Thus, given the record, defendant cannot rely on any such refusal as the basis for holding that the court's ruling constituted error entitling it to a pretrial judgment. Nor is our conclusion changed because the court had in camera access to the settlement agreements.
 
 
 32
 Alternatively, if defendant's footnote can be read to attack the denial by the court of defendant's later formal pretrial motion for production of the settlement agreements, the answer is that had they been produced they would not, without more, have entitled defendant to summary judgment even assuming that the motion was timely. This is so because further evidentiary proceedings would have been necessary, at least with respect to the Falcon Jet settlement, before the court could possibly have determined that the settlement proceeds exceeded any potential verdict.[2] 2] Thus, defendant did not show that it was entitled to pretrial judgment.[3]
 
 3. Exclusion of Certain Defense Evidence
 
 33
 Finally, defendant contends that the district court erred in its pretrial ruling on plaintiff's motion-in-limine that excluded evidence at trial tending to show that plaintiff resold the G-III Purchase Agreement. The district court ruled that such evidence was "irrelevant and inadmissible for the purpose of showing that plaintiff did not suffer the full amount of the alleged overcharge." (J.A. at 65). We review the district court's ruling under an abuse of discretion standard. See Pfeiffer v. Marion Ctr. Area Sch. Dist. Bd. of Sch. Directors, 917 F.2d 779, 781 (3d Cir.1990) ("[R]elevance decisions are discretionary and reviewable only for abuse of discretion.").
 
 
 34
 We have affirmed the district court's conclusion that plaintiff had antitrust standing. We also agree with the district court that, because plaintiff was the proper party to bring this action, it had "a right to recover all damages for [the] overcharge, regardless of how much of the overcharge it actually absorbed...." (J.A. at 63). Accord Illinois Brick Co. v. Illinois, 431 U.S. 720, 746, 97 S.Ct. 2061, 2075, 52 L.Ed.2d 707 (1977). Thus, there was no abuse of discretion in excluding this evidence if offered to "prove that plaintiff [could not] recover as damages the entire amount of the overcharge." (J.A. at 63).
 
 
 35
 The court therefore concludes that the various grounds asserted in defendant's appeal lack merit.
 
 B. Plaintiff's Appeal
 1. The G-IV Purchase Agreement
 
 36
 Plaintiff's appeal first attacks the order of the district court granting defendant's motion for summary judgment on plaintiff's claim arising out of its agreement to purchase the G-IV from GAC--the manufacturer of the G-IV jet aircraft and a codefendant in this case. Our review is plenary.
 
 
 37
 It is not seriously disputed that the price specified in the G-IV Purchase Agreement may have included an overcharge caused by defendant's antitrust violation. Pursuant to that purchase agreement, plaintiff made installment payments to GAC of approximately ten percent of the total purchase price. However, prior to the date on which the G-IV would have been delivered (and the remaining ninety percent of the purchase price would have been due), plaintiff settled its antitrust claims against GAC. As part of the GAC Settlement Agreement, plaintiff transferred all its right, title and interest in the G-IV and the G-IV Purchase Agreement back to GAC. In return for its interest in the G-IV and the purchase agreement, plaintiff received a payment of $2,171,866. This amount exceeded plaintiff's ten percent down payment on the G-IV by over $800,000.[4]
 
 
 38
 Plaintiff argues that because the GAC Settlement Agreement refers to the transaction as a "sale" of plaintiff's interest to GAC rather than a "cancellation" of the purchase agreement, plaintiff is entitled to recover damages from defendant in the amount of any overcharge reflected in the G-IV Purchase Agreement.
 
 
 39
 Plaintiff, in our view, seeks to attach unwarranted significance to the words "cancellation" and "sale." Whether the GAC Settlement Agreement is termed a cancellation or a sale, the substance of the transaction remains the same. Plaintiff was effectively released from any obligation under the G-IV Purchase Agreement prior to the date on which the plane would have been delivered and the bulk of the purchase price would have been due. In addition, plaintiff appears to have made a significant "profit" on the transaction.
 
 
 40
 The Supreme Court has cautioned against permitting "legality for antitrust purposes [to] turn on clever draftsmanship." Simpson v. Union Oil Co., 377 U.S. 13, 24, 84 S.Ct. 1051, 1058, 12 L.Ed.2d 98 (1964). Otherwise, the antitrust laws could be circumvented "merely by clever manipulation of words, not by ... substance." Id. at 22, 84 S.Ct. at 1057; cf. Commissioner v. Danielson, 378 F.2d 771, 774 (3d Cir.) (applying similar rule under the federal tax laws), cert. denied, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967). The district court properly looked to the undisputed effect of the settlement agreement and concluded that plaintiff had received an amount that more than compensated it for its payment plus interest and thus it could not have suffered any overcharge or consequential damages.[5] The district court correctly granted defendant's motion for summary judgment on this claim.
 
 2. The G-III Purchase Agreement
 
 41
 As previously noted, plaintiff's G-III claim went to trial and the jury rendered a verdict for plaintiff. Thereafter, the district court determined, based on a post-verdict motion, that the sums the plaintiff received from the other six manufacturers by way of settlements exceeded the amount of the jury verdict. In accordance with the governing law, it therefore properly entered judgment for defendant, unless it committed error in calculating the setoffs. See Baughman v. Cooper-Jarrett, Inc., 530 F.2d 529, 533 (3d Cir.), cert. denied, 429 U.S. 825, 97 S.Ct. 78, 50 L.Ed.2d 87 (1976).
 
 
 42
 Both plaintiff and defendant agree that the proper determination of damages requires a two-part calculation. First, the court must treble the jury's award. Second, the court must then set off any amounts received earlier as settlements of the antitrust claims involved in this case. See Baughman, 530 F.2d at 533; Flintkote Co. v. Lysfjord, 246 F.2d 368 (9th Cir.), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). The parties also agree that the district court correctly trebled the jury verdict of $997,500 to arrive at a total verdict of $2,992,500. Plaintiff argues, however, that the district court committed an error in arriving at the amount it received in settlement of its antitrust claims from the defendant Mitsubishi Aircraft International, Inc. ("Mitsubishi"). It was partly because of such error, says plaintiff, that the total setoff from the six settlements was in excess of the trebled verdict.
 
 
 43
 a. Mitsubishi Settlement
 
 
 44
 We address plaintiff's settlement with the defendant Mitsubishi, keeping in mind that the following facts are undisputed. Plaintiff ultimately executed two separate settlement documents with Mitsubishi. Pursuant to the First Mitsubishi Settlement, plaintiff was to receive: 1) $300,000 in cash; 2) one Mitsubishi Diamond II airplane for $2,600,000; and 3) options to purchase two additional Diamond II airplanes for $2,600,000 each. Mitsubishi represented to plaintiff that the market price for a Diamond II was approximately $3,200,000. The First Mitsubishi Settlement also obligated plaintiff to forfeit $75,000 of the $300,000 in cash if plaintiff did not purchase at least one Diamond II.
 
 
 45
 The First Mitsubishi Settlement contained a most favored nation clause under which plaintiff promised Mitsubishi that it would not settle its claims against any other defendant for less than a specified dollar amount. Despite the apparent value of the First Mitsubishi Settlement, the most favored nation clause stated in pertinent part: "The parties hereto stipulate that for purposes of this paragraph of this agreement only, and for no other purposes, this settlement has a present value of $400,000.00 for the benefit of the plaintiff[ ] and as a cost to Mitsubishi." (J.A. at 823).
 
 
 46
 Subsequently, when plaintiff tried to sell its options on the Diamond II's, it became aware that the market price for a Diamond II was actually $600,000 less than Mitsubishi had represented. Thus, plaintiff's right/options to purchase Diamond II's were worthless and the value of the Mitsubishi Settlement to plaintiff was reduced by approximately $1,800,000. Plaintiff contacted Mitsubishi and threatened, inter alia, to rescind the First Mitsubishi Settlement and/or to sue Mitsubishi under Texas law for damages for misrepresentation. Although plaintiff never formally revoked the First Mitsubishi Settlement, ultimately Mitsubishi paid plaintiff $1,800,000 in cash and plaintiff and Mitsubishi signed the Second Mitsubishi Settlement covering all claims between the parties (including the earlier antitrust claims).
 
 
 47
 The basic issue presented is whether, under the undisputed facts above, the district court was entitled to include the $1,800,000 in calculating the Mitsubishi setoff.[6] Plaintiff, relying largely on the most favored nation clause, says that the amount of the setoff should be no more than $400,000. It notes that it never formally revoked the first settlement and argues that the $1,800,000 in cash was received in settlement of a potential state law fraud claim and not in partial settlement of plaintiff's antitrust claim.
 
 
 48
 Momentarily passing over the fact that a most favored nation clause is generally included for the benefit of a settling defendant (rather than a plaintiff), by its express terms the most favored nation clause in this case is inapplicable to the valuation of the settlement for purposes of calculating setoff. Even if we were to indulge in the unlikely assumption that plaintiff intended that the most favored nation clause be somehow applicable for setoff purposes, the $400,000 amount improperly fails to include the represented value of the options that plaintiff received. See Merola v. Atlantic Richfield Co., 515 F.2d 165, 172 (3d Cir.1975) (discussing valuation of antitrust settlement for purposes of attorneys' fees; "[W]here the benefit [from a settlement] is in non-monetary form, the district court must bring an informed economic judgment to bear in assessing its value. If probative evidence of the monetary value of such a benefit is available, it should of course be used."). As other courts have recognized, the value of options received in an antitrust settlement must be considered when valuing that settlement, at least where the plaintiff intends to exercise those options. See Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 640 F.Supp. 697 (S.D.Ohio 1986); see also Bal Theatre Corp. v. Paramount Film Distrib. Corp., 206 F.Supp. 708, 714 (N.D.Cal.1962) (recognizing that in antitrust context, "[t]he rule ... seems to be that anything of value received should be set off in addition to the cash settlement").
 
 
 49
 It is true that courts have adopted the parties' valuation of their settlement, provided the record supported that valuation. In this case, however, we think the record supports the district court's finding that the $1,800,000 received in the second settlement was properly set off. The fact that plaintiff threatened to sue Mitsubishi for fraud does not alter the reality that the second settlement proceeds were part of the true value of the original settlement.[7] Any other approach to the second settlement would do violence to the equitable principle that one who has recovered from one coconspirator may not recover the same item of damage from another conspirator. Baughman, 530 F.2d at 533.
 
 
 50
 Finally, we do not consider that the affidavit of Mitsubishi's in-house counsel, Yukihisa Hotta, creates a disputed issue of material fact. Mr. Hotta stated that the $1,800,000 "represented threatened single damages under the Texas [fraud] statute...." (J.A. at 913).[8] Plaintiff says this representation is unchallenged. Nevertheless, it amounts to no more than a mathematical truism. The pertinent question is not what the $1,800,000 may have "represented", but rather, what claim or claims it was in fact paid to settle. By the terms of the Second Mitsubishi Settlement, the $1,800,000 was paid to settle all claims between the parties--including the antitrust claims. In addition, we note that Mr. Hotta's affidavit refers to "threatened single damages" of $1,800,000. The amount of these threatened damages was simply the amount plaintiff believed it was defrauded in the First Mitsubishi Settlement.
 
 
 51
 The district court ruled that the total amount of this settlement set off from the jury award should be $2,025,000 rather than the $400,000 specified in the most favored nation clause of the first settlement agreement. Thus, whether presenting an issue of law or ultimate fact, we conclude that the district court committed no error in including the amount of the second settlement in the setoff calculation. In so concluding, we reiterate that neither in the district court nor on appeal does plaintiff challenge the district court's right to resolve the merits of this issue on the record before it.
 
 
 52
 b. Application Of Total Amounts of All Settlements To Verdict on G-III
 
 
 53
 The amount of the total Mitsubishi Settlement when combined with the other five settlements exceeded the trebled amount of the jury verdict and thus seemingly dictated a judgment for defendant. However, plaintiff argues that the district court erred in refusing to allocate the proceeds received from the settlements among the three claims originally at issue in this lawsuit. It emphasizes that the settlements occurred prior to the date the district court granted summary judgment on two of the claims.
 
 
 54
 The allocation issue is important because, if meritorious, the so-called Falcon Jet settlement aside,[9] it would mean that the aggregate amounts of the setoffs would only partially cover the amount of the jury verdict and would thus require that the judgment for defendant be vacated. In refusing to make the allocations sought by plaintiff, the district court seems to have relied primarily on its conclusion that such an allocation would have been "irreconcilable with the outcome of this case" because "[t]wo of the three claims did not survive summary judgment." (J.A. at 81). While the district court also relied on the "equities," we need not reach that ground here.
 
 
 55
 We are not persuaded that hindsight evaluation of a general settlement of claims based on a subsequent determination of their relative merits as against a non-settling defendant should be dispositive of their settlement values. After all, the incentive to settle typically flows from uncertainty as to the outcome. But our disagreement with the hindsight approach here does not end the matter.
 
 
 56
 None of the six settlement instruments here purported to allocate the settlement proceeds among the three common claims asserted against all defendants on a joint-liability basis. Plaintiff, nevertheless, asserted in the district court as it does here that each settlement sum should be allocated for setoff purposes among the three claims, in certain percentages, based on the purchase prices of the three planes in question. Thus, in plaintiff's view, only 30 percent of each of the six settlements should be set off against the verdict, because of the relationship of the base price of the G-III to the total of the base prices of all three planes. Nevertheless, such an allocation, in and of itself, would have no inexorable relationship to the litigation value the settling parties attached to each claim when all were still viable. We therefore agree with the district court that such an approach is not acceptable here and that Baughman does not dictate otherwise. See Baughman, 530 F.2d 529.
 
 
 57
 Plaintiff next argues that the district court should have held an evidentiary hearing to determine a "fair" allocation of the claims for each of the six settlements. Determining after the fact how parties to a general settlement valued various claims in arriving at their settlement is inherently difficult. Consequently, such valuations would be unlikely to represent precisely what factors each party weighed and how it valued them in reaching the settlement. To add to the uncertainty, the settling defendants would ordinarily have no interest in how the proceeds were allocated among the various claims. On the other hand, the plaintiff would have a real interest in aggrandizing by hindsight the amounts attributable to the claims now known to have been decided in favor of the defendant.
 
 
 58
 Given the foregoing considerations, we conclude that where a plaintiff executes a general settlement instrument which settles multiple claims with a defendant, but a non-settling defendant is not a party to that agreement, the non-settling defendant need show only that the plaintiff settled a claim on which the non-settling defendant was found liable at trial. If the defendant makes this showing, the burden then shifts to the plaintiff to prove that, under the terms of its agreement with the settling defendant, the settlement or part thereof did not represent damages arising under the same theory of liability as those forming the basis for the jury award. The view we adopt is consistent with the rule that a settling plaintiff is entitled to only one full recovery while at the same time it protects the plaintiff from the application of amounts received in settlement of unrelated claims.
 
 
 59
 We note that our conclusion is in substantial agreement with the position of the Court of Appeals for the Tenth Circuit, albeit in a federal securities law context. See U.S. Indus., Inc. v. Touche Ross & Co., 854 F.2d 1223, 1262-63 (10th Cir.1988). Nor does the rule we adopt do a disservice to the antitrust enforcement scheme. This rule does not deter a plaintiff from incorporating a good-faith allocation of the settlement proceeds among multiple claims. What it does do is prevent a plaintiff from waiting "for the jury's verdict to allocate the settlement in a way that reduces the remaining defendants' credit." McDermott, Inc. v. Clyde Iron, 979 F.2d 1068, 1080 (5th Cir.1992). To the extent other circuits can be said to have taken a different position, e.g., I.T.O. Corp. v. Sellman, 967 F.2d 971 (4th Cir.1992), we conclude that their rulings do not fully serve the purposes of meaningful predictability and certainty. Thus, we find no error in the refusal of the district court to allocate the amounts of the settlements of the six codefendants among all three claims for setoff purposes.[10]
 
 
 60
 3. Refusal of District Court to Enter Judgment Promptly
 
 
 61
 The judgment was not entered in this case until four months after the jury verdict in order to first resolve the setoff issues. Plaintiff says the judgment should have been entered at once, thereby starting interest to run. The contention is based on the assumption that the judgment would be modified. Since we have not done so, the issue is academic.
 
 III. CONCLUSION
 
 62
 The judgment of the district court will be affirmed as to the appeals at Nos. 91-5932 and 91-5965.
 
 
 63
 GREENBERG, Circuit Judge, filing the opinion of the court as to Part II.A.1.c. and concurring in the balance of the opinion of the majority.
 
 
 64
 In this opinion I deal with two issues. Part I is the opinion of the court with respect to Cessna's argument that Gulfstream III Associates lacks standing to bring this action because it unconditionally assigned its antitrust rights by transferring its interest in the G-III and purchase agreement to JB & A Aircraft. Part II is my concurring opinion with respect to an issue raised by Cessna which I believe should be met by the court but which is not resolved in the majority opinion.
 
 I.
 
 65
 Cessna has argued that Gulfstream III Associates is not a proper plaintiff because its antitrust cause of action was transferred to JB & A Aircraft, Inc. as part of a general assignment. Gulfstream III Associates entered into a "Purchase Agreement Assignment" with JB & A, assigning "all of [Gulfstream III Associates'] rights, title and interest in and to the [G-III] Aircraft and [the original Purchase Agreement between Gulfstream III Associates and manufacturer Gulfstream American Corporation]." (J.A. 356.) JB & A later assigned the Purchase Agreement to R.H. Macy & Co., which ultimately took delivery of the completed aircraft. In asserting that this general assignment must include antitrust claims, Cessna relies upon a general provision of the Uniform Commercial Code, Section 1-201(36), enacted in, inter alia, Texas, Georgia, and New Jersey.[1] Section 1-201(36) provides in toto that " 'rights' includes remedies," from which Cessna apparently concludes that the assignment of a contract necessarily includes the assignment of all related causes of action. To the contrary, Gulfstream III Associates argues that antitrust claims can be transferred only by means of an express assignment; in Gulfstream III Associates' view, the general assignment of the Purchase Agreement therefore did not abrogate its right to bring this action. We agree with Gulfstream III Associates' position, and thus will affirm the district court's holding that Gulfstream III Associates is the correct plaintiff to pursue this action.
 
 
 66
 There is no serious doubt that an antitrust claim can be expressly assigned. In many cases, such assignments are accepted sub silentio; indeed, it is commonplace for individual persons claiming antitrust injury to assign their claims to an association formed for the specific purpose of pursuing litigation. See, e.g., Jefferson County Pharmaceutical Ass'n, Inc. v. Abbott Lab., 460 U.S. 150, 103 S.Ct. 1011, 74 L.Ed.2d 882 (1983) (trade association of retail pharmacists pursued Robinson-Patman Act claims as assignee of claims of its individual members); Chiropractic Coop. Ass'n of Michigan v. American Medical Ass'n, 867 F.2d 270 (6th Cir.1989) (association brought monopolization claims that had been assigned to it by individual chiropractors); Hahn v. Oregon Physicians' Service, 786 F.2d 1353 (9th Cir.1985) (podiatrists formed corporation to which they assigned their antitrust claims). See also In re Fine Paper Litig., 632 F.2d 1081, 1090 (3d Cir.1980) (citing "a number of cases [which] have assumed that such assignments [of antitrust claims] are valid").
 
 
 67
 We believe it is also clear that the validity of the assignment of an antitrust claim is a matter of federal common law. We so stated, albeit without analysis, in Fine Paper, supra: "In any event, the status of assignments under the Sherman and Clayton Acts is a matter of federal law." There, numerous plaintiffs, including paper distributors and several states, had brought antitrust class actions against paper manufacturers. The distributors were granted class certification; but most of the states, including Washington, were denied such certification. However, Washington was also the assignee of certain distributors' antitrust claims pertaining to paper products that Washington had purchased. We upheld the validity of those partial express assignments. Id. at 1090-91.
 
 
 68
 There are two bases for considering the status of an assignment of antitrust claims to be a matter of federal common law. First, the issue of assignment is appropriate for the development of interstitial federal common law in harmony with the overall purposes of the antitrust statutes. Second, assignments of antitrust claims cannot appropriately be left to determination under possibly differing state law standards, because such assignments may implicate the "direct purchaser" rule enunciated in Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), and in Kansas v. UtiliCorp United Inc., 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990).
 
 
 69
 It has long been assumed that federal courts have the power to create so-called "interstitial" federal common law to govern issues closely interwoven with a broad scheme of federal statutory regulation. See generally 1A James W. Moore et al., Moore's Federal Practice, pt. 2, p 0.324 (1993). This power is exercised frequently in antitrust law. See, e.g., National Soc'y of Professional Engineers v. United States, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978) ("[t]he legislative history [of the Sherman Act] makes it perfectly clear that [Congress] expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition"). In particular, the assignment issue of the present case is analogous to a limitations question resolved by application of federal common law in American Pipe & Constr. Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). American Pipe was an action involving Sherman and Clayton Act claims, originally brought by the State of Utah as a class action. Class status was denied for failure to fulfill the numerosity requirement of Fed.R.Civ.P. 23(a). Parties who would have been members of the rejected class later sought to intervene; the district court held the intervenors' claims to be time-barred, because even though Utah's action was timely filed, the applicable limitations period had run before the filing of the motions to intervene. The Supreme Court held that the intervenors were not time-barred, because the filing of Utah's putative class action tolled the limitation statute for all purported class members who made a later, but otherwise timely, motion to intervene. The applicable limitation statute, Section 5(b) of the Clayton Act, 15 U.S.C. § 16(b), specified the limitation period but did not provide for tolling for purported class members. The Court nonetheless thought it appropriate to create the tolling provision in a situation where "tolling the limitation ... is consonant with the legislative scheme." Id., 414 U.S. at 558, 94 S.Ct. at 768.
 
 
 70
 In American Pipe, the judicial creation of a tolling provision was proper because it furthered the Clayton Act limitation period's purposes of balancing a finite end to litigation against fair opportunity for injured parties to assert meritorious antitrust claims. In the present case, we believe that the determination of an assignment's validity similarly is related to the broader questions of antitrust injury and standing. We therefore make explicit what was implicit in Fine Paper, i.e., that the status of an assignment of antitrust claims is a matter of federal common law. The analogy of American Pipe would itself be sufficient basis for this determination.
 
 
 71
 However, our foregoing determinations that express assignments of antitrust claims are permissible, and that the validity of assignments is determined by federal common law, do not fully answer the question raised by Cessna, namely, whether a general assignment can include antitrust claims. To answer that question, we must consider the potential relationship between the UtiliCorp/ Illinois Brick "direct purchaser" rule and the assignments of antitrust claims. Because we conclude that the inclusion of antitrust claims in a general assignment would be disfavored under the direct purchaser rule, we hold that only an express assignment of an antitrust claim can be valid.
 
 
 72
 The direct purchaser rule had its genesis in Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), which held that a Clayton Act defendant could not assert a defense that the plaintiff had suffered no "injury" because it had passed on any illegal overcharges to consumers. Illinois Brick subsequently made this "direct purchaser" rule bilateral, i.e., that case held that a state, the indirect purchaser of concrete block, could not pursue price-fixing claims against manufacturers--only the direct purchasers, masonry contractors, could pursue such claims. The rule of Illinois Brick was founded on the difficulty of analyzing pricing decisions, the risk of multiple liability for defendants, and the weakening of private antitrust enforcement that might result from splitting damages for overcharges among direct and indirect purchasers. UtiliCorp further strengthened the direct purchaser rule; there, the Court refused to create an exception to Illinois Brick for states suing in a parens patriae capacity to redress economic harms to their citizens from an alleged natural gas price-fixing conspiracy. The petitioner states had argued that an exception was appropriate where, as they claimed, it could be demonstrated that the direct purchasers, public utilities, had passed along all of the alleged overcharges to utility customers. The Court rejected this argument, noting that even in that instance, pricing decisions by utilities could be based on other factors. The Court cautioned that any suggestion in Hanover Shoe and Illinois Brick of a possible exception for pre-existing cost-plus contracts must be construed very narrowly.
 
 
 73
 In the present case, Cessna has argued both that the general assignment to JB & A precludes Gulfstream III Associates from pursuing its claim, and that the direct purchaser rule would not dictate that Gulfstream III Associates is the proper plaintiff. We agree with Cessna's approach insofar as we see the issues of assignment and application of the direct purchaser rule as corollaries. However, we disagree with Cessna in that we believe the present state of the direct purchaser doctrine requires that Gulfstream III Associates, and not JB & A or any later purchaser of the aircraft, is the proper party to seek a recovery for antitrust injury. It is true that this case as presented for trial dealt with only a single aircraft whose price when originally purchased by Gulfstream III Associates easily can be compared to the prices later agreed to by JB & A and by the ultimate purchaser, R.H. Macy & Co. Nonetheless, we believe that any exception to the direct purchaser rule would be inappropriate in this case for the same reasons that the Supreme Court held an exception would be inappropriate in UtiliCorp.
 
 
 74
 In our case, determining the relative extent of injury incurred by the direct or remote purchasers would entail several highly speculative inquiries. Could Gulfstream III Associates have charged JB & A the same price even absent the illegal overcharge? What alternative products might provide elasticity in the resale market for aircraft purchase agreements? What factors other than the original overcharge influenced the price of the product in the assignment to JB & A? In addition, direct purchaser Gulfstream III Associates probably remained liable by contract for any shortfall between prices paid by the remote purchasers and the original price it had agreed to pay the manufacturer.[2] Nor is there any indication that the indirect purchasers were interested in pursuing the antitrust claims. Those facts weigh heavily in favor of considering Gulfstream III Associates to have suffered the entire antitrust injury of the price-fixing overcharges. In this case, just as in UtiliCorp, unwarranted complexities would arise from trying to apportion losses among direct and indirect purchasers. Id., 497 U.S. at 208-09, 110 S.Ct. at 2813-14. Despite Cessna's arguments concerning the unique nature of the G-III aircraft transaction, we see no circumstances here that could justify disregarding the Supreme Court's clear admonition that "it [would be] an unwarranted and counterproductive exercise to litigate a series of exceptions" to the direct purchaser rule. UtiliCorp, 497 U.S. at 217, 110 S.Ct. at 2817.
 
 
 75
 Gulfstream III Associates' status as direct purchaser, and the concomitant inference that neither JB & A nor Macy could assert this claim, lends crucial support to our holding on the assignment issue, i.e., that any assignment of antitrust claims, as a matter of federal common law, must be an express assignment; general assignments, without specific reference to antitrust claims, cannot validly transfer the right to pursue those claims. We so conclude because many routine transfers of ownership may involve a general assignment of rights. Because of the direct purchaser rule, such transfers cannot carry with them the right to assert antitrust claims. Therefore, interpreting a general assignment to include antitrust claims would run afoul of the direct purchaser rule. This conflict would be obviated by an express assignment, which entirely eliminates any problems of split recoveries or duplicative liability. There would be nothing to prevent a direct purchaser from expressly assigning its antitrust claims to a remote purchaser; see, e.g., Fine Paper Litigation, supra. However, in this case, Gulfstream III Associates made no express assignment of its antitrust claims to JB & A or any other remote purchaser, and Gulfstream III Associates therefore remained the proper plaintiff. Thus, we will affirm the district court's determination that the general assignment to JB & A did not abrogate Gulfstream III Associates' right to pursue price-fixing claims pertaining to the G-III aircraft.
 
 II.
 
 76
 I agree with the reasoning and result of Judge Seitz's opinion for the majority and thus join in the judgment of the court. However, I write separately to address an issue that I believe Cessna has squarely presented, but the majority has not confronted. The issue is whether, if an antitrust defendant can demonstrate before trial that prior settlements will offset any recovery of damages for the plaintiff, the plaintiff must nonetheless be permitted a trial on liability in order to establish that it is, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15, a "person ... injured in his business or property by reason of anything forbidden in the antitrust laws," who thus is entitled to a mandatory award of attorneys' fees. I conclude that the mandatory nature and the usual magnitude of antitrust fee awards dictate that a plaintiff must be permitted the opportunity to establish liability at trial, even when a fee award is the only remaining relief at issue.[3]
 
 
 77
 During the time that plaintiff Gulfstream III Associates was pursuing this case, it was also, along with other entities and individual plaintiffs, pursuing two related actions that had been filed separately in the District of New Jersey and were later consolidated: Gulfstream III Associates, Inc. v. Falcon Jet Corp., Civ. No. 85-4671, and Rosefielde v. Falcon Jet Corp., Civ. No. 82-3788 (collectively, the "Falcon Jet actions"). See Rosefielde v. Falcon Jet Corp., 701 F.Supp. 1053 (D.N.J.1988). The Falcon Jet actions asserted claims of price-fixing and monopolization substantively similar to the original claims in our case, although the Falcon Jet actions apparently sought recovery of overcharges for aircraft manufactured by Falcon Jet Corporation, whereas our case sought recovery of overcharges for aircraft manufactured by Gulfstream Aerospace Corporation. The Falcon Jet actions involved several contract and tort claims distinct from the antitrust allegations, and apparently involved different defendants than the present case. Those cases were settled by an agreement dated November 17, 1988, later amended as of March 30, 1989. The Falcon Jet settlement agreement called for a total consideration of $4,650,001.00 to be paid by the defendants. The agreement specifically allocated the settlement payment among the various claims, apportioning only a nominal $1.00 payment to antitrust claims, and apportioning all the rest of the payment to contract and tort claims.
 
 
 78
 In our case, Cessna brought a pretrial motion for summary judgment asserting, inter alia, that all possible damages had been satisfied by previous settlements with other co-defendants and with the Falcon Jet defendants. Cessna argued that the Falcon Jet allocation of $1.00 to antitrust claims was not a good-faith apportionment, and urged the district court to count a much larger part of the Falcon Jet settlement toward set-offs in the present case. By the time of Cessna's motion, plaintiff's expert economist had established the maximum possible measure of damages as a 15 percent overcharge due to price-fixing. While the district court did grant summary judgment to Cessna on claims relating to two other aircraft, it rejected Cessna's arguments as to the G-III aircraft. The district court reasoned that the total potential value of a damages award of 15 percent of the purchase price for that aircraft would be $4,488,750. Examining the confidential settlement agreements in camera, the court determined that the aggregate amount of all settlements with Cessna's former co-defendants in this case would be less than the maximum potential trebled damages. Further, the court held that Cessna would not be entitled to any set-off for the Falcon Jet settlement, because the settlement agreement applied the payments to claims distinct from the claims in this case. Thus, in resolving Cessna's summary judgment motion, the district court accepted the validity of the allocations of the Falcon Jet settlement payments.
 
 
 79
 Cessna renewed its argument on this point in two post-trial motions for a judgment dismissing the complaint, one motion brought before entry of judgment and a second motion to amend the final judgment. Cessna again asserted that some part of the Falcon Jet settlement actually related to claims identical to those in this case. By this point, of course, the jury had determined Gulfstream III Associates' damages to be only a 10 percent, not a 15 percent, overcharge, yielding trebled damages of $2,992,500. In response to Cessna's motions the district court reduced the amount of the verdict to zero, because the amounts received in settlement from Cessna's co-defendants in this action exceeded $2,992,500. However, the district court declined to revisit the question of whether Cessna was entitled to any set-off for the settlement of the Falcon Jet actions, reasoning that the issue was moot in view of the complete set-offs from settlements within the present action. The district court also refused Cessna's request to dismiss the complaint, and thus permitted Gulfstream III Associates to proceed with a fee application. The ultimate fee award exceeded $1.1 million.
 
 
 80
 I think the district court incorrectly characterized the Falcon Jet issue as moot in view of the continuing entitlement to a fee award. I believe that post-trial, Cessna clearly was arguing that some reasonable set-off for the Falcon Jet settlements would mean that Gulfstream III Associates would have had no potential damage recovery going into trial, and this would have required dismissal of the complaint and a denial of any fee award. This is also the point Cessna has, I think, clearly raised on appeal, though it again has been unsuccessful in this attempt, as the majority has determined that other set-offs have rendered the Falcon Jet issue moot. See majority opinion, at 436 n. 10.
 
 
 81
 I would address Cessna's question, although I would not arrive at an answer to its liking. I do not think the validity of the Falcon Jet allocations needs to be revisited, because I would find that regardless of a complete set-off of any potential damages, an antitrust plaintiff, for whom a fee award is, of course, a mandatory part of the recovery dictated by statute, must be afforded an opportunity to establish, by trial if necessary, the liability of the defendant that is a predicate of the plaintiff's entitlement to fees.
 
 
 82
 It is axiomatic that Section 4 of the Clayton Act, 15 U.S.C. § 15, is a mandatory fee award provision:any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws ... shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
 
 
 83
 The courts have often distinguished this mandatory fee award from the permissive fee award provision of the Civil Rights Act, 42 U.S.C. § 1988 ("the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs"). See, e.g., United States Football League v. National Football League, 887 F.2d 408, 412 (2d Cir.1989) ("prevailing party" analysis under 42 U.S.C. § 1988 is not relevant to mandatory fee scheme of Section 4 of Clayton Act); see also Baughman v. Cooper-Jarrett, Inc., 530 F.2d 529, 531 n. 2 (3d Cir.) (fee award is mandatory under 15 U.S.C. § 15), cert. denied, 429 U.S. 825, 97 S.Ct. 78, 50 L.Ed.2d 87 (1976); Home Placement Serv., Inc. v. Providence Journal Co., 819 F.2d 1199, 1210 (1st Cir.1987) (award of fees is mandatory to encourage private prosecution of antitrust violations); Hydrolevel Corp. v. American Soc. of Mechanical Engineers, Inc., 635 F.2d 118, 130 (2d Cir.1980) ( 15 U.S.C. § 15 "expressly requires" an award of attorneys' fees), aff'd, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982).
 
 
 84
 It is clear that an antitrust plaintiff is entitled to recover substantial attorneys' fees even if it is awarded only nominal damages. That is exactly what happened in United States Football League v. National Football League, 704 F.Supp. 474 (S.D.N.Y.), aff'd, 887 F.2d 408 (2d Cir.1989), cert. denied, 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 (1990). In that case, the jury had determined, on special interrogatories, that defendant NFL had monopolized the market for major league professional football in violation of Section 1 of the Sherman Act, and that the NFL's anticompetitive behavior had injured the plaintiff. However, the jury chose to award only nominal damages of $1.00. 704 F.Supp. at 476. The defendant asserted, by analogy to cases involving fee awards under 42 U.S.C. § 1988, that plaintiff USFL was not a "prevailing party" and had not achieved a threshold level of damages sufficient to be entitled to attorneys' fees. The district court rejected any analogy to permissive fee awards, and held that "the jury's finding of injury and an antitrust violation precludes the NFL's arguments that the USFL was not a prevailing party under Section 4 of the Clayton Act.... A reasonable fee award under the statute is mandatory." 704 F.Supp. at 480. The court awarded the USFL attorneys' fees of $5,515,290.81. Id. at 488. The court of appeals affirmed the fee award in its entirety. 887 F.2d 408 (2d Cir.1989), cert. denied, 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 (1990).
 
 
 85
 Even granting that a nominal damages award can support Clayton Act attorneys' fees, would a plaintiff whose entire damages are offset by prior settlement, and who therefore receives zero damages as a result of the trial, still be entitled to attorneys' fees? The Court of Appeals for the Fifth Circuit answered that precise question affirmatively in Sciambra v. Graham News, 892 F.2d 411 (1990). In Sciambra, the district court had entered a default judgment against one remaining defendant because of discovery abuse. (A second defendant had settled previously for $165,000.) A damages judgment was entered for $271,896.00, but was reversed because the district court had applied an incorrect measure of damages. On remand, the plaintiff conceded that his damages according to the proper measure would be less than the amount of the prior settlement. The district court therefore awarded no damages, but did enter judgment for over $90,000 in attorneys' fees and costs. In affirming the award, the court of appeals found that in an antitrust case, an attorneys' fee award should not necessarily be dependent on a compensatory damages award: "the effect of the [prior] settlement on [plaintiff's] recovery of compensatory damages has no effect on [plaintiff's] right to recover attorneys' fees." Id. at 416. So long as plaintiff has established an antitrust violation and injury therefrom, the court concluded, an award of attorneys' fees is mandatory. That result, the court noted, was consistent with the established policies of encouraging private prosecution of antitrust violations and deterring violations of the antitrust laws. Id. at 416.
 
 
 86
 The reasoning and the result in Sciambra follow inexorably from the holdings of USFL, and both those cases follow from the classic rationales supporting mandatory Clayton Act fee awards. If one accepts that USFL and Sciambra were rightly decided, then it is clear that an antitrust plaintiff can proceed to trial for a determination of liability and a potential fee award, even where prior settlements already have clearly negated any actual receipt of further damages. The very magnitude of antitrust fee awards indicates that they are a crucial component of a plaintiff's recovery, and in many instances fee awards may exceed certain components of the compensatory damages. In USFL the plaintiff received over $5.5 million in fees; in our case, Gulfstream III Associates has been awarded fees of over $1.1 million, or more than 25% of the amount that it received in settlements. Surely such fee awards are a cornerstone of the accepted private-attorneys-general rationale of the antitrust statutes; and if a plaintiff has established violation of the law and injury, then, as the Sciambra court recognized, the amounts realized from settlements cannot properly be used to exonerate a non-settling defendant from liability for fees.
 
 
 87
 One might fear that permitting trials merely for the sake of determining fee awards would lead to frequent abuse and a waste of judicial resources. However, such fears are unfounded because of the rarity of circumstances that might require such trials. For example, it is exceptional to have a case, such as the present one, where maximum potential damages can be determined precisely and where one could ascertain clearly that settlement amounts exceeded the maximum damages. Even when such exceptional cases might occur, a plaintiff and remaining defendant(s) may well be more likely to settle without trial once they can focus on the amount of a potential fee award.
 
 
 88
 Moreover, a defendant need not remain inert while a plaintiff racks up ever-larger fees. At the point where a defendant thinks the plaintiff has settlements exceeding the amount of its damages as trebled, the defendant could move for partial summary judgment establishing that it could not be liable for additional damages. At the same time, at its option, the defendant, subject to the court's granting its motion on damages, could concede its liability for the plaintiff's fees to that point in the litigation, with the fees to be fixed by the court in the usual manner.[4] If the court determined that the settlements did offset any possible trebled damages, it would then fix the fees and the matter would be over in the district court. On the other hand, if the defendant obtained a judgment that the plaintiff could recover no further damages but did not offer to pay the plaintiff's fees to that point, the plaintiff would be forced to reappraise the strength of its case to determine if it wanted to proceed against the nonsettling defendant. Overall, I think it would be a rare case which would continue simply to determine a defendant's liability for fees after a court had held that the plaintiff's damages were offset completely by settlement.
 
 
 89
 Further, I would emphasize that in the present case the potential set-offs derived from settlements reached between the time of filing suit and the time the case came on for trial. This action originally was filed in the Central District of California in 1985 (having been transferred thereafter to the District of New Jersey); the Falcon Jet settlements were not reached until late 1988 and early 1989. We are not faced here with a situation in which a potential plaintiff receives from several potential defendants settlements that would be large enough to offset all damages before a suit is filed, but nonetheless commences an action purely to seek attorneys' fees from a recalcitrant defendant. I presume that, if faced with such a situation, a court rightly might reject such a plaintiff's claim for fees.
 
 
 90
 Altogether, holding that an antitrust plaintiff may proceed to trial even if only a fee award remains to be determined, is the only outcome consistent with the weight of authority on entitlement to antitrust fees. I do not think such a ruling would create significant practical problems for trial courts, because the cases in which it would be applicable would be very rare. Therefore, I would resolve the question raised by Cessna and would hold that even where settlements entered into following the commencement of litigation have offset all damages, an antitrust plaintiff may try the issue of liability as the necessary predicate to establishing an entitlement to attorneys' fees.
 
 
 91
 SLOVITER, Chief Judge, concurring in part and dissenting in part.
 
 
 92
 As the majority opinion recognizes, this appeal and cross-appeal raise several difficult and previously unaddressed issues about the calculation of settlement offsets in an antitrust case. Although the court is fractured on several of the issues raised by the appeal and cross-appeal, I note that we are unanimous on many of the issues resolved by Judge Seitz's opinion. I join all of that opinion except Part II B.2.a holding that all of the $1.8 million Second Mitsubishi Settlement was properly included in the $2,025,000 which the district court offset against the trebled jury verdict.[1] I also join in Part I of Judge Greenberg's separate opinion representing the majority view on the issue of the effect of the assignment of the purchase contract by Gulfstream III.
 
 I.
 
 93
 Central to my view of the effect of the two settlement agreements Gulfstream III entered into with Mitsubishi are the following facts from the record. When Gulfstream III entered into the First Mitsubishi Settlement, dated August 6, 1985, settling its antitrust claims against Mitsubishi, it had been led by Mitsubishi to believe that the market price for the Diamond II aircraft which it agreed to purchase from Mitsubishi for $2,600,000 (and the two for which it received options to purchase) was approximately $3,200,000. After Alan Rosefielde, President of Gulfstream III, discovered that the market price for a Diamond II was approximately $2,600,000, he wrote to Raymond S. Vinton, Vice President and General Counsel of Mitsubishi, alleging that Mitsubishi had "defrauded" him by representing to him "as a material condition of [the first] settlement that the selling price of the Diamond II aircraft was to be held at $3,195,000" and asserting that "[a] review of [Mitsubishi's] files indicates that the [represented selling price] was an outright lie uttered in an attempt to deceive me into entering the settlement agreement." App. at 922. Rosefielde's letter identified three possible responses Gulfstream III could make to the alleged fraud: (1) sue for fraud; and/or (2) sue for rescission and put Mitsubishi back in the antitrust suit; or (3) reach a settlement. App. at 924.
 
 
 94
 In the letter Rosefielde suggested that as a settlement he would expect "a concession of $600,000 per aircraft for three aircraft for a total sum of $1,800,000" and that this alternative favored Mitsubishi because if, instead, Rosefielde were to "retain counsel in Texas [he would] seek this amount plus an equal amount in pun[i]tive damages." App. at 924.
 
 
 95
 On December 22, 1986, Gulfstream III and Mitsubishi, without rescinding the First Mitsubishi Settlement, entered into the Second Mitsubishi Settlement whereby Mitsubishi paid Gulfstream III an additional $1.8 million and in exchange Gulfstream III released all claims,
 
 
 96
 specifically including but not limited to all causes of action pleaded or that could have been pleaded or asserted in [the antitrust suit] ... and all claims that have been made or could have been made by [plaintiff] relating to or arising out of the negotiation, entry, signing and performance of the following:
 
 
 97
 (a) The settlement agreement dated August 6, 1985 and all options and agreements referred to therein [the First Mitsubishi Settlement] ...;
 
 
 98
 (b) The Joint and Mutual Release in Full dated August 14, 1985;
 
 
 99
 (c) The Diamond II Purchase Agreement dated August 21, 1985 and all options and agreements referred to therein.
 
 
 100
 App. at 803, 805 (emphasis added).
 
 
 101
 Notwithstanding the express reference in the Second Mitsubishi Settlement to the potential fraud claims, the district court included all of the $1.8 million from that settlement in the amount to be offset against the trebled jury verdict Gulfstream III received against Cessna. The court concluded that "the approximate value of each of plaintiffs' three options [to purchase an aircraft at a set price] in the First Mitsubishi Settlement Agreement[2] was $600,000" and that the $1.8 million transferred in the Second Mitsubishi Settlement "demonstrates the value of the options conveyed in the [F]irst Mitsubishi [S]ettlement." App. at 75. In reaching this conclusion, the district court rejected the parties' own valuation of the First Mitsubishi Settlement as $400,000. Instead, it included the full $1.8 million because the language in the Second Mitsubishi Settlement expressly released Mitsubishi from any of Gulfstream III's potential antitrust claims against Mitsubishi and because the $1.8 million paid in that settlement "approximately" equaled the difference between the misrepresented market price of the Diamond II aircraft and the purchase and/or option price in the First Mitsubishi Settlement.
 
 
 102
 The majority essentially agrees with the district court, stating that "[t]he fact that [Gulfstream III] threatened to sue Mitsubishi for fraud does not alter the reality that the second settlement proceeds were part of the true value of the original settlement." Majority op. at 434 (emphasis added). Assuming that a subsequent settlement and other evidence not known or available to the parties at the time of a settlement can be used to quantify the value of the initial settlement, I believe that there is no basis on this record to allocate the entire $1.8 million cash received to the First Mitsubishi Settlement. Moreover, the majority fails to elucidate the facts on record on which it relies to establish "the reality" of the settlement transaction.
 
 II.
 
 103
 In the portion of its opinion dealing with the allocation of settlements to multiple claims (Part II B.2.b), the majority establishes a sequential order of proof and burden shifting that I think is apt for all calculations of settlement offsets in antitrust cases. The majority states that a non-settling defendant meets its burden when it shows that the plaintiff settled the claim at issue, after which the burden shifts to the plaintiff to prove that the settlement did not represent damages arising under the same theory of liability as that forming the basis for the jury award.[3] I would adopt that framework in dealing with the issue whether the $1.8 million conveyed in the Second Mitsubishi Settlement represented only damages for the antitrust claim for which the jury awarded Gulfstream III damages against Cessna.
 
 
 104
 Cessna met its initial burden by showing that the Second Mitsubishi Settlement covered, inter alia, the antitrust claim. The burden then shifted to plaintiff to show that it covered more. However, the majority never discusses whether it is holding that plaintiff failed to meet that burden. It merely states that "the record supports the district court's finding that the $1,800,000 received in the second settlement was properly set off." Majority op. at 434. The district court also failed to analyze this issue under that burden shifting framework. I think it is clear from uncontradicted evidence in the record that plaintiff met its burden to show that the Second Mitsubishi Settlement resolved more than just the antitrust claims resolved in the First Mitsubishi Settlement.
 
 
 105
 In the first place, we must look to the language of the settlement agreement itself. As the district court acknowledged, and as Cessna admitted at oral argument, the plain language of the Second Mitsubishi Settlement covers "all claims that have been made or could have been made by [plaintiff] relating to or arising out of the negotiation, entry, signing, and performance of" the First Mitsubishi Settlement, not merely the antitrust claims settled by the First Mitsubishi Settlement. App. at 75, 805. The plaintiff's claim of fraud arising out of the negotiation of the First Mitsubishi Settlement is obviously encompassed by this language.
 
 
 106
 The second inquiry must be the intent of the parties. In Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), the Supreme Court stated that the intentions of the parties to a settlement agreement in an antitrust case as to what that agreement covers were controlling in determining whether the settlement agreement should be offset against the jury verdict. Specifically, the Court said that
 
 
 107
 to the extent that the ... settlement which [plaintiff] received in return for the ... release was understood by the parties to provide compensation for future damages[,] ... [the antitrust coconspirator who was not a party to the release] would have available to it a defense of payment [for the same future damages it was ordered to pay].... However, the record below indicates that a defense of payment could not here be sustained for ... the undisputed and unimpeached testimony of [plaintiff's] witnesses was that the ... settlement was understood by the parties as compensation only for [plaintiff's] damages up to the date of the release.
 
 
 108
 Id. at 348, 91 S.Ct. at 811 (emphasis added) (citations omitted); see also Carpa, Inc. v. Ward Foods, Inc., 536 F.2d 39, 55 (5th Cir.1976) ("The intention of the parties to the release is the controlling factor as to just what damages are covered.").
 
 
 109
 Here again, Gulfstream III has met its burden to demonstrate that the intent of the parties to the Second Mitsubishi Settlement was to settle more than Gulfstream III's antitrust claims by producing evidence to that effect from both parties to that agreement. Plaintiff filed a declaration by Rosefielde, its President and negotiator, stating:
 
 
 110
 I considered this [state law fraud and misrepresentation] action against Mitsubishi to be very strong. I subsequently settled this matter ... with Mitsubishi paying to [Gulfstream III] the single amount of damages for which Mitsubishi would be liable under the Texas statute, namely $1.8 million.... In short, [the Second Mitsubishi Settlement] was for new claims of fraudulent conduct under state law which I asserted against Mitsubishi, and not [a] settlement of the price fixing claims in this action, which had been settled in [the First Mitsubishi Settlement].
 
 
 111
 App. at 908.
 
 
 112
 Thereafter, plaintiff filed a supplemental declaration by Rosefielde that stated that the Second Mitsubishi Settlement
 
 
 113
 settled new, independent state law fraud and misrepresentation claims which had arisen against Mitsubishi, as set forth fully in my prior declaration ... and in the affidavit of Yukihisa Hotta. The [First Mitsubishi Settlement], which settled the price fixing claim on the Gulfstream airplanes at issue in this action, remained intact. That prior agreement was not rescinded, nor was the consideration Mitsubishi paid refunded.
 
 
 114
 App. at 935 (emphasis added).
 
 
 115
 Further, plaintiff filed an affidavit as to the intent of Mitsubishi, the only other party to that settlement, from Yukihisa Hotta (Hotta Affidavit), Mitsubishi's in-house counsel, stating:
 
 
 116
 The claims threatened by [Gulfstream III] in the fall of 1986 related to alleged misrepresentations pertaining to the term of sale of a Diamond II aircraft and an option to purchase two additional Diamond II aircraft. The claims were threatened under the Texas Deceptive Trade Practices Act and were viewed as serious claims by myself and Mitsubishi's outside counsel, the law firm of Fulbright & Jaworski.
 
 
 117
 ... Mitsubishi denied liability, but agreed to settle these claims in December, 1986 for $1.8 million, which represented threatened single damages under the Texas statute, which provides for treble damages plus attorneys' fees.[4]
 
 
 118
 App. at 913 (emphasis added).
 
 
 119
 Cessna produced no refutation of the signed and sworn affidavits by the representatives of the two parties to the Second Mitsubishi Settlement Agreement and thus they remain unimpeached. The district court never found that the credibility of either of the affiants was at issue, nor is it likely that it could have since there was no evidentiary hearing on this issue. The majority opinion dismisses the significance of the statement in the Hotta Affidavit that the $1.8 million "represented threatened single damages" for fraud and misrepresentation, as a "mathematical truism." Majority op. at 435. I do not understand that statement. If, as the majority acknowledges, the $1.8 million was paid to settle "all claims between the parties," Majority op. at 434, then Hotta's statement that the money "represented" a settlement for the fraud and misrepresentation is not inconsistent with a finding that the settlement covered more than merely the antitrust claims.
 
 
 120
 Once plaintiff met its burden to produce evidence showing that the $1.8 million was not paid merely to settle antitrust claims which Mitsubishi had already settled and for which it already had a release, the burden of proof once again shifted to Cessna. Payment is an affirmative defense which must be proven by the party asserting it. See Fed.R.Civ.P. 8(c). In a comparable situation where an employer obliged to pay workers' compensation benefits seeks to offset a later settlement, the courts have held that the employer bears the burden of proof regarding the apportionment of that settlement. See I.T.O. Corp. v. Sellman, 967 F.2d 971, 973 (4th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1579, 123 L.Ed.2d 147 (1993); Force v. Director, Office of Workers' Compensation Programs, 938 F.2d 981, 985 (9th Cir.1991).
 
 
 121
 In light of plaintiff's production of unimpeached and unrebutted evidence that it had a viable claim under the Texas fraud statute which was released by the Second Mitsubishi Settlement, defendant's burden to prove otherwise was not a light one. I do not think it was met by the slender reed of evidence that Rosefielde had accused Mitsubishi of overvaluing the price of the Diamond II plane by $600,000 and multiplying that amount by three because there were three planes referenced in the First Mitsubishi Settlement (one for purchase and two via conditional options to purchase). There is no other evidence of record to support the district court's conclusion, which the majority has adopted. There are many reasons on the record why that mere fact cannot support the conclusion reached.
 
 
 122
 First, it is based on the unreasonable assumption that Mitsubishi would settle with Rosefielde at the full demanded price. There is no evidence to support that; every other defendant settled plaintiff's claim at a discounted figure. Second, the district court valued no other option in an equal manner. For example, the district court valued the Atlantic Aviation Settlement based on actual receipts even though the settlement included an unexercised option (essentially valuing the option at $0). Third, it is unrealistic to value the option to purchase the plane at $600,000 (even if the represented price had been overvalued by $600,000) because of the transaction costs to Gulfstream III, a secondary seller, of financing the purchases, finding a buyer, and selling the planes. Fourth, valuing each option at $600,000 fails to account for the fact that the option to purchase the two planes was conditional on the purchase of the first, and in fact Gulfstream III never did so. Thus, even if those conditional options had some value, it could not have been the full $600,000 discount from the sales price.
 
 
 123
 Fifth, the $2,025,000 value which the district court assigned to the Mitsubishi Settlements is grossly out of line with the values of the other settlements which ranged from $251,392.58 (the Atlantic Aviation Settlement) to $600,000 (the Gates Learjet Settlement). Neither the majority nor the district court proffers any explanation why Mitsubishi, one of seven jointly and severally liable codefendants, would pay Gulfstream III in settlement almost $1.5 million more than any other defendant. Finally, the district court did not assign any value at all to the released claim of fraud, although it never made a finding that claim had no value under the Texas statute.
 
 
 124
 The majority sidesteps whether the issue of the allocation of the settlement between claims is one of fact or law. If it is an issue of law, then I believe the mere fact that the amount paid in the Second Mitsubishi Settlement approximated the claimed discrepancy in represented sales price is simply insufficient as a matter of law to overcome unrefuted evidence which shows that the Second Mitsubishi Settlement covered the potential fraud and misrepresentation claim. If it is a question of fact, then there was at least a genuinely disputed factual issue presented, and an evidentiary hearing should have been held.
 
 
 125
 It may be that it was a tactical error for plaintiff to have argued that all of the $1.8 million was paid solely to settle the potential state law fraud and misrepresentation claim against Mitsubishi for its conduct in the course of the first settlement and that none of that amount was attributable to the earlier antitrust claim. But it was no more, and probably less, of a tactical error than that committed by Cessna, who had the burden of proof on the payment issue, and who made no showing of the amount of the $1.8 million that should have been attributed to the fraud. Although it appears that neither party sought an evidentiary hearing on the apportionment issue, I believe that there was an inadequate evidentiary basis for the district court's conclusion and, in the present posture of the case, I would remand for an evidentiary hearing and appropriate factfinding.
 
 
 126
 The issue of valuation and allocation of settlement offsets is a significant one for antitrust policy. I fully agree with the majority that antitrust verdicts must be offset by settlements received from jointly and severally liable codefendants to prevent the plaintiff from receiving a windfall recovery from the non-settling defendants. See Zenith Radio, 401 U.S. at 348, 91 S.Ct. at 811 ("the law ... does not permit a plaintiff to recover double payment"). However, as the majority recognizes, ensuring that plaintiffs receive a full recovery for their injuries is a second and equally important policy concern. See Flintkote Co. v. Lysfjord, 246 F.2d 368, 398 (9th Cir.) ("a plaintiff is entitled to one full satisfaction of his claim in an action against joint defendants"), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); see also U.S. Industries, Inc. v. Touche Ross & Co., 854 F.2d 1223, 1236 (10th Cir.1988) ("where two or more defendants are responsible for separate injuries, an amount received in settlement from one defendant for one of the injuries may not be used to reduce the liability of the other defendant for the other injury").
 
 
 127
 This second policy is particularly applicable in the antitrust context where Congress enacted a treble damages provision and authorized private antitrust suits to ensure the most complete enforcement of the antitrust laws. See Burlington Indus., Inc. v. Milliken & Co., 690 F.2d 380, 393 (4th Cir.1982) ("[O]ne purpose of the trebling provision is to encourage private plaintiffs to bring suit. Any ultimate recovery totaling less than three times proven damages would weaken the statutory incentive through judicial construction."), cert. denied, 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983); Hydrolevel Corp. v. American Soc'y of Mechanical Eng'rs, Inc., 635 F.2d 118, 130 (2d Cir.1980) (same quotation), aff'd, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982); Flintkote, 246 F.2d at 398 (holding that offsets are calculated after trebling the verdict because the "efficacy [of the treble damages provision] should not be weakened by judicial construction"); see also Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 639, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981) (refusing to adopt contribution rule in antitrust cases and noting that Congress was not "concerned with softening the blow on joint wrongdoers").
 
 
 128
 I believe the majority's holding on the Mitsubishi offset undermines this strong policy.
 
 
 
 [1]
 Plaintiff enters into purchase agreements with manufacturers years in advance of the date on which the planes will be ready for delivery. In that sense plaintiff is a consumer. In addition, however, plaintiff routinely sells its interest in these planes/purchase agreements shortly before the planes are ready for delivery. Thus, in some instances plaintiff is competing with the manufacturer who is also selling another such product, at the same time, to the same consumers
 
 
 [2]
 Plaintiff brought a separate action against the Falcon Jet Corporation, a manufacturer of business jet aircraft that is not a party to this suit. The Falcon Jet litigation involved, in part, the same price fixing conspiracy. The Falcon Jet Settlement contained an express allocation of the monies received among claims and attorneys' fees. Only $1 was allocated to the category of "all other claims" which included the antitrust claims arising out of the price fixing conspiracy. Defendant argues that the $1 allocation was made in bad faith and that a substantially greater portion of the settlement should be set off from the jury's verdict in this suit
 
 
 [3]
 Although not specifically headed in its briefs, defendant also argues that the district court should have granted its post trial motion for judgment nunc pro tunc dismissing the complaint on the ground that the trebled jury verdict was wholly setoff by the amounts received by plaintiff in the prior settlements. We cannot find that the district court erred in declining to grant this relief post-trial. We so conclude because, as we have held, defendant was not entitled to pretrial judgment
 
 
 [4]
 Plaintiff also received an additional $400,000 in settlement of any antitrust claims it might have had against GAC
 
 
 [5]
 Plaintiff attempts to bolster its argument by asserting that it would never have agreed to cancel the purchase agreement because such a cancellation would have resulted in the loss of a $1,000,000 tax deduction. This argument was not raised before the district court and we decline to address it. See Knop v. McMahan, 872 F.2d 1132, 1143 n. 20 (3rd Cir.1989)
 
 
 [6]
 The parties do not explicitly contend that the resolution of this issue requires us to determine whether federal or state law applies. In either event, we think that the same considerations of preventing duplicative recovery would obtain. See Restatement (Second) of Torts § 885(3) (1979)
 
 
 [7]
 As the district court stated:
 The Second Mitsubishi Settlement Agreement, although releasing Mitsubishi from any claims that could have arisen out of the options in the First Mitsubishi Settlement Agreement, also releases it from causes of action "specifically including but not limited to all causes of action pleaded or that could have been pleaded or asserted in" this action. Plaintiff[ ] [has] not explained this language away. Nor [has it] explained away the fact that.... the approximate value of each of plaintiff['s] three options ... was $600,000. The amount of cash transferred in the second Mitsubishi settlement thus demonstrates the value of the options conveyed in the first Mitsubishi settlement.
 (citation omitted).
 
 
 [8]
 Mr. Hotta's affidavit states, in pertinent part:
 (3) The claims threatened by Gulfstream III Associates, Inc. and Gulfstream IV Associates, Inc. in the fall of 1986 related to alleged misrepresentations pertaining to the term of sale of a Diamond II aircraft and an option to purchase two additional Diamond II aircraft. The claims were threatened under the Texas Deceptive Trade Practices Act and were viewed as serious claims by myself and Mitsubishi's outside counsel, the law firm of Fulbright & Jaworski.
 (4) Mitsubishi denied liability, but agreed to settle these claims in December, 1986 for $1.8 million, which represented threatened single damages under the Texas statute, which provides for treble damages plus attorneys' fees.
 (J.A. at 913).
 
 
 [9]
 See supra note 2
 
 
 [10]
 Because we have affirmed the judgment here, it is unnecessary to consider on these appeals whether, as defendant asserts, all or some part of the settlement in the Falcon Jet litigation should also have been set off against the verdict. See supra note 2
 
 
 [1]
 The Purchase Agreement Assignment provided that Texas law would govern its provisions (J.A. 360); New Jersey is of course the forum state; and the original Purchase Agreement provided that Georgia law would apply to its provisions (J.A. 416). Because we conclude that federal common law governs the assignment of an antitrust cause of action, there is no issue as to what state's law would apply
 
 
 [2]
 The district court in its opinion of August 30, 1990, rejecting Cessna's argument that Gulfstream III Associates was not a direct purchaser and thus lacked standing, indicated that "Cessna does not dispute plaintiff['s] contentions that plaintiff[ ] remained liable for the balance of the contract price" after the assignment. In its opening brief on the appeal, Cessna did not dispute this statement, though in its reply brief it equivocated, indicating that it was "assuming, for argument's sake" that Gulfstream III Associates remained liable. We need not pursue the point because even if we concluded that the assignment terminated Gulfstream III Associates' liability under the original agreement, we would not change our result
 
 
 [3]
 My discussion presumes that the present state of the law would not permit set-offs to be applied against a fee award. See Auwood v. Harry Brandt Booking Office, Inc., 850 F.2d 884, 894 (2d Cir.1988)
 
 
 [4]
 Cessna did not offer to pay Gulfstream III Associates' fees when it made its pretrial motion for summary judgment, so I do not consider the implications of such an offer in this case
 
 
 [1]
 There is no dispute about the inclusion of $225,000, which was the total cash received from the First Mitsubishi Settlement
 
 
 [2]
 Notwithstanding the district court's reference to "three options," Gulfstream III agreed to purchase one Diamond II aircraft and had only conditional options to purchase two more, dependent on Gulfstream III taking financial delivery of the first aircraft. App. at 819, 822-23
 
 
 [3]
 Specifically, the majority's rule states:
 [W]here a plaintiff executes a general settlement instrument which settles multiple claims with a defendant, but a non-settling defendant is not a party to that agreement, the non-settling defendant need show only that the plaintiff settled a claim on which the non-settling defendant was found liable at trial. If the defendant makes this showing, the burden then shifts to the plaintiff to prove that, under the terms of its agreement with the settling defendant, the settlement or part thereof did not represent damages arising under the same theory of liability as those forming the basis for the jury award. The view we adopt is consistent with the rule that a settling plaintiff is entitled to only one full recovery while at the same time it protects the plaintiff from the application of amounts received in settlement of unrelated claims.
 Majority op. at 436.
 
 
 [4]
 See Texas Deceptive Trade Practices--Consumer Protection Act, Tex.Bus. & Com.Code Ann. §§ 17.41-17.63 (Vernon 1987)