**David LERMAN, Appellant in 92–5526,**

v.

**JOYCE INTERNATIONAL, INC., a Corporation of the State of Delaware, and Norman Pell,**

**Joyce International, Inc., Appellant in 92–5574.**

**Nos. 92–5526, 92–5574.**

United States Court of Appeals, Third Circuit.

Argued July 12, 1993.

Decided Nov. 10, 1993.

Sur Petition for Rehearing Dec. 10, 1993.

Judd Burstein, P.C., of Counsel and on the brief, Judd Burstein (argued), Kim P. Bonstrom, Kathy McLaughlin, New York City, for appellant, David Lerman.

DeBevoise & Plimpton, New York City (Robert N. Schwartz (argued), Christopher A. Murphy, Melvin F. Williams, Jr., of counsel), Shanley & Fisher, P.C., Morristown, NJ (Mary E. Tracey, of counsel), for appellee-cross-appellant, Joyce Intern., Inc.

Before: BECKER, ALITO, and ROTH, Circuit Judges.

### OPINION OF THE COURT

ALITO, Circuit Judge:

In this appeal, both Joyce International, Inc. ("Joyce"), and David Lerman ("Lerman") challenge a consolidated judgment entered by the district court. Joyce seeks reversal of the judgment in favor of Lerman on his claims for breach of his severance agreement, and Lerman seeks reversal of the judgment in favor of Joyce on its racketeering counterclaims. We affirm the district court in all respects.

### I.

In May 1984, Joyce purchased from the

Litton Selling Entities ("Litton")[1] an unincorporated division called the Litton Office Products Center ("LOPC"). LOPC sells and distributes office furniture and office supplies. The purchase agreement for LOPC provided that the LOPC assets acquired by Joyce included "without limitation, any and all of the following: ... causes of action, judgments, claims and demands of whatsoever nature."

David Lerman, an executive vice president of LOPC, was a highly successful commission salesman. His accounts produced approximately $6 million a year in business, about one-fifth of LOPC's entire annual production for his region. Unbeknownst to LOPC, however, from the late 1970s until 1986, Lerman and several LOPC sales associates paid bribes to the purchasing agents of LOPC's customers. In order to obtain cash for these bribes, Lerman and his associates developed a fraudulent billing scheme that allowed them to sell goods from the LOPC inventory for cash without the knowledge of the LOPC billing department. Lerman and his associates used this cash primarily to bribe purchasing agents, but they also used some of the cash to purchase personal items, such as food and liquor, and to provide small loans to friends.

In 1986, Lerman terminated his employment with LOPC. Joyce and Lerman signed a severance agreement creating a transition period during August and September of 1986. Lerman agreed that during this period he would "exercise his best efforts" to train the sales personnel working on his former accounts. In addition, the agreement, as interpreted by the district court, implicitly obligated Lerman to introduce Joyce's senior management to the purchasing agents connected with these accounts. In exchange, Lerman was to receive two years of monthly payments, as well as full commissions for sales made to certain of his former accounts during the transition period. Although Lerman made little effort to introduce Joyce's management personnel to his accounts, Joyce nevertheless issued his first severance check on November 1, 1986.

At about this time, however, the sales personnel working on Lerman's former accounts left LOPC and took most of those accounts with them. Joyce approached Lerman about changing the terms of the training component of the severance agreement, and Lerman agreed to the modification in principle but asked that it be put in writing, as the severance agreement required. Joyce drafted a modification, but the parties never ratified it. Instead, Joyce stopped making severance payments to Lerman.

In February 1987, Lerman filed this action, based on diversity of citizenship, in the United States District Court for the District of New Jersey. Lerman asserted a claim for breach of the severance agreement, as well as other related contract and tort claims.[2] Joyce subsequently discovered Lerman's earlier misconduct and filed numerous counterclaims, including one alleging violation of the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1961 *et seq.*, one alleging violation of New Jersey's "RICO" statute, N.J.Stat.Ann. 2C:41, and several based on breach of the severance agreement.[3] After a five-week bench trial, the district court found in favor of Lerman on his claims for breach of the severance agreement. While the district court found that Lerman had also breached that agreement by failing to introduce Joyce's senior management to the purchasing agents assigned to his accounts, the court found that Lerman's breach was not material. The court therefore held that Joyce had improp-

---

1. The Litton Selling Entities consisted of Litton Industries, Inc. and some of its wholly owned domestic and foreign subsidiaries.

2. Lerman's other claims were based on estoppel, unjust enrichment, breach of the covenant of good faith and fair dealing associated with the severance agreement, fraudulent inducement to enter into the severance agreement, tortious interference with contract, and intentional infliction of emotional harm.

3. Joyce also filed counterclaims alleging breach of the implied covenant of good faith and fair dealing arising from the severance agreement, breach of Lerman's employment contract, breach of the implied covenant of good faith and fair dealing arising from Lerman's employment contract, breach of Lerman's fiduciary duty to LOPC, and the tortious conversion of LOPC's goods.

erly rescinded the severance agreement and was consequently liable to Lerman for $540,771.97 in damages and prejudgment interest.

The court also held, however, that Lerman was liable to Joyce on its RICO counterclaims. While most of the conduct that formed the basis for these claims had occurred before Joyce purchased LOPC, the court held that Joyce had acquired Litton's RICO claims pursuant to the purchase agreement for LOPC. In the alternative, the court held that Joyce could assert RICO claims in its own right and that the damages for those claims were the same as the damages for the RICO claims acquired from Litton.

In calculating the amount of damages due on the RICO counterclaims, the court found that Lerman had converted $263,000 in inventory and that the inventory would have been marked up approximately 43% before sale to customers. The resulting figure of $376,000 was trebled under RICO to $1,128,000. Prejudgment interest increased the award to $1,445,987.77. In addition, the district court awarded attorney's fees and expenses in the amount of $1,133,863.68.

The district court also found in favor of Joyce on most of its other counterclaims, but the court found that the damages for these claims were the same as those awarded under the racketeering counterclaims. However, with respect to the counterclaims based on the severance agreement, the court found that Lerman's breach of the agreement had not caused Joyce any damage because the loss of Lerman's former accounts had resulted from the departure of the sales assistants, not from Lerman's failure to make introductions on behalf of senior management.

After the entry of a single, consolidated judgment, the district court denied Lerman's motion to alter or amend the judgment, and both Lerman and Joyce filed timely notices of appeal.

## II.

In its appeal, Joyce contests the district court's finding that Lerman's breach of the severance agreement was not material. Joyce contends that the district court's allegedly erroneous finding requires us to vacate the judgment of $540,771.97 in favor of Lerman and the dismissal of Joyce's counterclaim for breach of the severance agreement. Both the parties and the district court agree that the interpretation and enforcement of the severance agreement are governed by New York law.[4] Under New York law, rescission of a contract is permitted only when the other party's breach is "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Callanan v. Powers*, 199 N.Y. 268, 92 N.E. 747, 752 (1910); *accord Septembertide Pub., B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 678 (2d Cir.1989). Moreover, under New York law, the materiality of a breach is a question of fact. *See Jacob & Youngs, Inc. v. Kent*, 230 N.Y. 239, 129 N.E. 889, 890 (1921); *Anderson Clayton & Co. v. Alanthus Corp.*, 91 A.D.2d 985, 457 N.Y.S.2d 578, 579 (2d Dept 1983). Therefore, we cannot grant Joyce the relief it requests in its appeal unless we hold that the district court committed clear error (Fed.R.Civ.P. 52(a)) in finding that Lerman's breach was not material.[5]

The severance agreement consisted of 12 numbered paragraphs and contained many features other than the contested provision regarding introductions. The preamble stated that the agreement had been reached because

LOPC Division of Joyce International, Inc. desires to achieve a timely, appropriate and expeditious transfer of Lerman's customers and sales accounts, both existing and prospective, from Lerman to various

4. Paragraph 12 of the severance agreement specifically provides that "[t]his Agreement shall be construed and enforced in accordance with the laws of the State of New York."

5. In its opening brief, Joyce asserted only one ground for reversal: that "the District Court ...

was clearly erroneous in finding that [Lerman's] breach was not material." Joyce Br. at 2. *See also id.* at 25, 31. In its reply brief, Joyce also advanced a somewhat different argument. We address this argument at page 110, footnote 6, *infra.*

LOPC employees on the terms and conditions hereinafter set forth.

In order to achieve this objective, the agreement provided that Joyce would offer employment to certain sales assistants who would be taking over the Lerman accounts (¶ 3) and that Lerman would not compete with LOPC for two years (¶ 4). Paragraph six, the subject of the dispute between Joyce and Lerman, provided that Lerman was to "exercise his best efforts" during the transition period of August and September 1986 to train the sales assistants who would be taking over his accounts and to introduce them to the purchasing agents for those accounts. Paragraph 6 also provided that "[s]aid training and indoctrination shall be provided to all other LOPC personnel as deemed necessary by Company management." The district court found that this language implicitly required Lerman to introduce Joyce's senior management to the purchasing agents assigned to his accounts, but the court found that the material component of paragraph six, with which Lerman had complied, was the training of the sales assistants and the transfer of Lerman's accounts to them, not the making of introductions on behalf of senior management. The court found that the agreement contemplated that these assistants would induce the Lerman accounts to remain with LOPC. "[O]ne visit to introduce a senior desk man to a purchasing agent," the court stated, "is not a particularly important event in terms of keeping an account." App. 3677.

The court also noted that Joyce had specifically reserved to itself the right to control the scheduling of introductions but that Joyce had never scheduled introductions for its senior management. Indeed, paragraph six required Joyce to create a schedule listing the accounts with respect to which it wanted Lerman to make introductions for its senior management, but such a list was never compiled. "[F]rankly," the district court opined.

had it been truly material to get front line management personally introduced to these accounts, that list would have been prepared very promptly and annexed to this agreement, circulated to the executives involved, and a program consistent with the reserved right of the company to control scheduling and the agenda would have been put into place.

App. 3678–79. Furthermore, the court noted that Joyce had asked Lerman to comply with his contractual obligations after the end of the transition period, and the district court found that this willingness to secure Lerman's aid after the expiration of the time frame mentioned in paragraph six demonstrated that "literal compliance ... was not considered a material feature of the Severance Agreement during the transition phase." *Id.* at 3679–80. Finally, the court noted that Joyce had lost the Lerman accounts, not because of Lerman's failure to introduce senior management to the purchasing agents, but because of the unrelated departure of the sales assistants, who took the Lerman accounts with them. Thus, the court concluded that Lerman's failure to make those introductions did not result in the loss of those accounts.

■ Joyce contends that the district court committed clear error because "[t]he evidence at trial amply demonstrated that the introduction of senior management was the critical, indeed, the only long-term method of securing the $6 million in business that Lerman's accounts represented." Joyce Brief at 27. Joyce argues that its "fundamental problem was always that these accounts would remain vulnerable so long as their principal contacts at Joyce were with commission salesmen instead of salaried managers." *Id.* at 28. While we recognize the force of this argument, it does not persuade us that the district court committed clear error. The district court carefully analyzed the evidence, and its finding that Lerman's breach was not material was entirely reasonable.[6]

---

6. In its reply brief, Joyce argues that the district court committed legal error by "failing to distinguish [its] defense to Lerman's breach of contract claim from [its] counterclaim." Reply Br. at 1–2. Joyce suggests that the district court found that Lerman's breach of the severance agreement was not material solely because the court believed that Joyce lost Lerman's former accounts due to the departure of the sales agents rather than Lerman's failure to make introductions on behalf of senior management. Joyce suggests that Lerman's breach could be material even if it did not result in any damages.

We generally do not entertain arguments that are made for the first time in a reply brief. *See*

## III.

In his appeal, Lerman contests the judgment for Joyce on its RICO counterclaims. Lerman begins by arguing that Litton did not effectively assign its RICO claims to Joyce. He then contends that the district court's judgment cannot be sustained based on Joyce's own RICO claim because Joyce was not itself damaged in the amount of the judgment. Finally, he challenges the district court's calculation of damages and attorneys fees.

### A.

We turn first to Lerman's argument that Joyce cannot as a matter of law recover on Litton's assigned RICO claims.

1. In his opening brief, Lerman contended that recovery on this claim is barred by the Supreme Court's decision in *Bangor Punta Operations, Inc. v. Bangor & A.R. Co.*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974). We see no merit in this argument.

In *Bangor Punta*, a parent corporation (Bangor Punta) allegedly mismanaged a railroad before selling it to another corporation, Amoskeag. The railroad and its subsidiary then filed an action for damages under federal and state law against Bangor Punta and a Bangor Punta subsidiary, but the Supreme Court upheld the dismissal of the action. The Court noted that Amoskeag would be the principal beneficiary of any recovery and that Amoskeag did not contend that "the purchase transaction was tainted by fraud or deceit," that it had "received less than full value for its money," or that it had "sustained any injury at all." *Id.* at 711, 94 S.Ct. at 2583. The Court therefore concluded that equitable principles prevented either Amoskeag or the railroad from recovering what the Court described as a "windfall." *Id.* at 712, 94 S.Ct. at 2584.

Although Lerman attempts to equate the situation in *Bangor Punta* with that in the present case, we see no parallel. The present case would resemble *Bangor Punta* if Joyce, in its own right, had sought to recover from the corporation that sold it LOPC (i.e., Litton) for harm that was done to LOPC before the sale and that Joyce knew or had reason to know about. In that situation, Joyce, like Amoskeag, would be seeking a "windfall." Instead, however, Joyce, standing in Litton's shoes, sought to recover from Lerman for the inventory that he had secretly misappropriated. Such a recovery can hardly be termed a "windfall." Thus, we believe that *Bangor Punta* is distinguishable on four grounds: (1) the present suit is against a third party rather than the seller; (2) here the purchase price was inflated because of the racketeering activities, and Joyce specifically paid for the right to assert claims such as this; (3) the claims in *Bangor Punta* were dependent on the sale because prior to the sale the injured party and the party causing the injury were the same; and (4) in contrast to *Bangor Punta*, which was deemed by the court to be an action by the shareholders who merely purchased an equity interest in the corporation, here there was a direct purchase of the entire corporation and all its assets and liabilities, including specifically all its causes of action. Accordingly, we reject Lerman's argument that *Bangor Punta* precludes Joyce's recovery.

2. In its reply brief, Lerman propounded additional arguments in support of the proposition that Joyce cannot recover on Litton's assigned RICO claims. We generally do not entertain arguments that are advanced for the first time in a reply brief. *See International Raw Materials, Ltd. v. Stauffer Chem. Co.*, 978 F.2d at 1327 n. 11. Moreover, we find Lerman's additional arguments unpersuasive.

*International Raw Materials, Ltd. v. Stauffer Chem. Co.*, 978 F.2d 1318, 1327 n. 11 (3d Cir. 1992), *cert. denied,* — U.S. —, 113 S.Ct. 1588, 123 L.Ed.2d 154 (1993). Moreover, we reject Joyce's argument on the merits because we disagree with its interpretation of the district court's reasons for finding that Lerman's breach was not material. As discussed in text, the court found that the principal purpose of paragraph six of the

severance agreement was to ensure that the sales agents, not senior managers, were introduced to the purchasing agents. App. 3678. We interpret the court's subsequent reference to the loss of the accounts when the sales agents departed (*id.* at 3680) as an illustration of the critical role that these agents played. We do not believe that the district court reasoned that Lerman's breach was not material because it did not cause damage.

a. Lerman maintains that Joyce could not recover on LOPC's assigned RICO claims because that assignment was allegedly not "express." We disagree.

■ As a general rule, "terms of art are not required for a valid assignment." *United States ex rel. Kelly v. The Boeing Co.*, 9 F.2d 743 (9th Cir.1993). *See also* E. Allan Farnsworth, *Contracts* § 11.3 at 786 (2d ed. 1990). However, in *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 438–40 (3d Cir.1993), we held that an assignment of a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, must be "express." Since this provision served as the model for the provision of the RICO statute authorizing private civil actions, 18 U.S.C. § 1964,[7] we assume that an assignment of a RICO claim must also be "express." We hold, however, that the assignment in this case is consistent with the rule adopted in *Gulfstream.*

In that case, Gulfstream III Associates purchased an aircraft and then resold it to JB & A. The agreement of sale assigned to JB & A all of Gulfstream III's "rights, title and interest" in the aircraft and its contract with the manufacturer. *Id.* at 431. JB & A then assigned this agreement to R.H. Macy & Co. *Id.* at 437. Considering whether Gulfstream III could subsequently maintain antitrust claims against the manufacturer, we first concluded that absent a valid assignment the "direct purchaser" rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), and *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990), would have prohibited both JB & A and R.H. Macy & Co. from asserting antitrust claims against the original manufacturer. We noted that "determining the relative extent of injury incurred by the direct or remote purchasers" would have entailed "several highly speculative inquiries." 995 F.2d at 439. Turning to the assignment, we then held that any assignment of an antitrust claim must be "express." We explained (*id.* at 440):

We so conclude because many routine transfers of ownership may involve a general assignment of rights. Because of the direct purchaser rule, such transfers cannot carry with them the right to assert antitrust claims. Therefore, interpreting a general assignment to include antitrust claims would run afoul of the direct purchaser rule. This conflict would be obviated by an express assignment, which entirely eliminates any problems of split recoveries or duplicative liability.

Stating that Gulfstream III had "made no express assignment of its antitrust claims," we held that Gulfstream III retained the right to assert those claims. *Id.*

■ We conclude that the assignment in this case does not violate the rule set out in *Gulfstream.* The wording of the assignment in this case contrasts sharply with that in *Gulfstream.* Here, Litton expressly assigned to Joyce "all of" LOPC's "causes of action, . . . claims and demands of whatsoever nature." In *Gulfstream*, on the other hand, the purchase agreement made no reference to legal causes of action or claims. Rather, it referred only to Gulfstream III's "rights, title and interest" in the aircraft and the contract with the manufacturer. As a result of the wording used in the assignment at issue here, we believe that the concern underlying the express assignment rule adopted in *Gulfstream* is satisfied. The *Gulfstream* court appears to have been troubled by the difficulty of determining on a case-by-case basis whether an assignment such as the one in that case had been intended by the parties to transfer antitrust claims. The wording of the assignment in this case, however, could not reasonably lead to such difficulty. The assignment refers to "all of" LOPC's "causes of action" and "claims . . . of whatsoever nature." This language is unambiguous and all-inclusive. Consequently, we hold that this assignment is "express" within the meaning of *Gulfstream.*

b. In a related argument, Lerman maintains that the assignment in this case is ineffective because it was "partial," i.e., it did

**7.** *See Holmes v. Securities Investor Protection Corp.*, —— U.S. ——, ——, 112 S.Ct. 1311, 1317, 117 L.Ed.2d 532 (1992).

not completely extinguish Litton's right to assert RICO claims. As noted, the purchase agreement provided that the LOPC assets acquired by Joyce included "without limitation, any and all of the following: ... causes of action, judgments, claims and demands of whatsoever nature." Lerman argues that this language, while conveying all causes of action and claims for damage *to LOPC,* did not convey Litton's "right to sue, on *behalf of Litton,* for injuries directly visited upon that entity." Lerman Reply Br. at 7 (emphasis in original).

We reject Lerman's interpretation of the relevant language in the purchase agreement. In our view, that language unambiguously extinguished Litton's right to assert any legal claims or causes of action against third parties based on its prior ownership of LOPC. Accordingly, the assignment was not partial, and Lerman's argument fails.

c. Lerman also contends that a RICO claim cannot be validly assigned unless the assignor is aware of the claim at the time of assignment and intentionally abandons it. In support of this argument, Lerman relies on bankruptcy cases holding that title to property in a debtor's estate remains vested with the trustee unless it is intentionally abandoned by some affirmative act. *See Stein v. United Artists Corp.,* 691 F.2d 885, 890 (9th Cir.1982). The purpose of this doctrine is to prevent a debtor from defrauding its creditors by withholding knowledge of a valuable asset until after its debts have been discharged. *Id.* at 890–91. The present case does not involve bankruptcy, and we see no reason for applying the rule on which Lerman relies in the present context.

In sum, we hold that Joyce was not barred from recovering on the RICO claims assigned to it under the purchase agreement. In light of this holding, we need not and do not reach Lerman's argument that the RICO claims asserted by Joyce on its own behalf cannot support the damages awarded by the district court.

■ 3. Lerman argues that even if Joyce can recover on the assigned RICO claims, the district court erred in calculating the damages awarded on those claims. As noted, the district court found that Lerman and his associates had converted $263,000 in inventory and that these goods would have been marked up about 43% before sale. Lerman contends that this calculation was erroneous because it did not take into account the benefits—chiefly increased purchases at higher prices—that LOPC supposedly derived from Lerman's bribery scheme.

In rejecting this argument, the district court found that Lerman's bribery had not benefitted LOPC. The court stated that "good salesm[a]nship with the customers involved or the direction of a comparable amount of effort to honest purchasing agents would ... have generated the same sales or perhaps even greater sales on a more solid footing, not dependent upon the presence of a particular susceptible purchasing agent." App. 3657. The court also rejected Lerman's testimony that the bribes resulted in higher prices. *Id.* 3658–59. In addition, the court found that Lerman's scheme had imperilled LOPC's reputation and had exposed it to civil and perhaps even criminal liability. *Id.* at 3659. These findings are not clearly erroneous, and accordingly Lerman's argument regarding the calculation of damages must be rejected.

### C.

■ Lerman's final argument is that the district court erred in calculating the attorney's fees and expenses awarded to Joyce. Lerman states that Joyce sought to recover more than three million dollars in damages based on "three, distinct racketeering schemes" but that Joyce actually recovered only $376,000 in compensatory damages (before trebling) based on only one of those schemes. Lerman Br. at 30. Lerman therefore maintains that Joyce achieved only "partial success on its RICO claims" and that its award should be reduced accordingly. *Id.* at 29.

Lerman's argument is based on the Supreme Court's decision in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Although *Hensley* concerned the award of attorney's fees under 42 U.S.C. § 1988, we have held that the same approach should be employed when fees are

awarded under RICO, 18 U.S.C. § 1964(c). *Northeast Women's Center v. McMonagle,* 889 F.2d 466, 470, 476–77 (3d Cir.1989), *cert. denied, Walton v. Northeast Women's Center, Inc.,* 494 U.S. 1068, 110 S.Ct. 1788, 108 L.Ed.2d 790 (1990). *See also FMC Corp. v. Varonos,* 892 F.2d 1308, 1315 (7th Cir.1990); *cf., Schultz v. Hembree,* 975 F.2d 572, 575 (9th Cir.1992).

In *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940, the Supreme Court stated that if a plaintiff is not completely successful, a court should consider the following two questions in awarding attorney's fees:

> First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

If the plaintiff presented "distinctly different claims for relief that are based on different facts and legal theories," *Hensley* stated, no fee should be awarded for services on unsuccessful claims. *Id. See also West Virginia University Hosp., Inc. v. Casey,* 898 F.2d 357, 362 (3d Cir.1990), and *Muth v. Central Bucks School Dist.,* 839 F.2d 113, 130 (3d Cir.1988). *Hensley* noted, however, that in other cases, "the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories" and that it may therefore be "difficult to divide the hours expended on a claim-by-claim basis." 461 U.S. at 435, 103 S.Ct. at 1940. "Such a lawsuit," *Hensley* explained, "cannot be viewed as a series of distinct claims. Instead, the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id. Hensley* added that in such a case "where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Id.*

Here, the district court concluded that Joyce's RICO counterclaims had not presented "distinctly different claims for relief," but rather related legal theories based on overlapping facts. *See* App. 560. The court stated that it would be "artificial ... to sever the factual allegations ... when each of the three

scenarios aided in the development of Joyce's successful case." *Id.* Moreover, the court found that "[w]hen Joyce's RICO counterclaims are viewed in terms of the litigation as a whole, their results must be judged as very successful." *Id.* at 559.

In awarding fees in this case, the district court applied the correct legal standards, and the court's application of those standards was not an abuse of discretion. *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941; *Northeast Women's Center,* 889 F.2d at 475–76. We therefore sustain the district court's award.

## IV.

In conclusion, we find no ground for reversing any part of the consolidated judgment entered by the district court. That judgment is therefore affirmed.

Before SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, and LEWIS, Circuit Judges.

## SUR PETITION FOR REHEARING

### Dec. 10, 1993

ALITO, Circuit Judge.

The petition for rehearing filed by appellant, David Lerman, in the above entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.