**In Re LINERBOARD ANTITRUST LITIGATION**

**This Document Relates to: The Procter & Gamble Company, et al. Plaintiffs,**

v.

**Stone Container Corp., et al. Defendants.**

(Civil Action No. 03C–3944, United States District Court for the Northern District of Illinois)·

No. MDL 1261.
CIV.A. Nos. 03–5231, 03C–3944.

United States District Court, E.D. Pennsylvania.

July 28, 2006.

---

## MEMORANDUM & ORDER

DuBOIS, District Judge.

### I. INTRODUCTION

Presently before the Court is Defendants' Motion for Summary Judgment Di-

rected to Plaintiff FAC Acquisition, LLC. Defendants assert that direct action plaintiff FAC Acquisition, LLC ("FAC") lacks standing to assert claims in this antitrust litigation because FAC never made any direct purchases from defendants and the antitrust claims of entities that did make direct purchases were not validly assigned to FAC. For the reasons set forth below, the Court concludes that FAC does not have standing to assert claims in this litigation and, therefore, grants defendants' motion for summary judgment.

## II. BACKGROUND

This multidistrict litigation involves allegations that a number of United States manufacturers of linerboard[1] engaged in a combination and conspiracy in unreasonable restraint of trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1, and various state antitrust statutes. The Court sets forth only an abbreviated factual and procedural history as pertinent to address defendants' pending Motion for Summary Judgment.

The factual background of the case is described at length in this Court's previous opinions. See In re Linerboard Antitrust Litig., MDL No. 1261, 2000 WL 1475559 (E.D.Pa. Oct. 4, 2000) ("Linerboard I "); In re Linerboard Antitrust Litig., 203 F.R.D. 197 (E.D.Pa.2001) ("Linerboard II "); In re Linerboard Antitrust Litig., 305 F.3d 145 (3d Cir.2002) ("Linerboard III "); In re Linerboard Antitrust Litig., 296 F.Supp.2d 568 (E.D.Pa.2003) ("Linerboard IV "); In re Linerboard Antitrust Litig., 2004 WL 1221350 (E.D.Pa. Jun.2, 2004) ("Linerboard V "); In re Linerboard Antitrust Litig., 223 F.R.D. 357 (E.D.Pa.

2004) ("Linerboard VI "); In re Linerboard Antitrust Litig., 223 F.R.D. 335 (E.D.Pa.2004) ("Linerboard VII "); In re Linerboard Antitrust Litig., 2005 WL 1625040 (E.D.Pa. July 11, 2005) ("Linerboard VIII ").

### A. The Class Case

Class plaintiffs named the following defendants in their Complaints and Amended Complaints—Stone Container Corporation, Jefferson Smurfit Corporation, Smurfit–Stone Container Corp., International Paper Company, Georgia–Pacific Corporation, Temple–Inland, Inc., Gaylord Container Corporation, Tenneco, Inc., Tenneco Packaging, Inc., Union Camp Corporation, Packing Corporation of American and Weyerhaeuser Paper Company—and alleged that these defendants conspired to raise the price of corrugated containers and corrugated sheets throughout the United States by restricting production and/or curtailing inventory in violation of federal antitrust laws.

By Memorandum and Order dated September 4, 2001, this Court certified the following two plaintiff classes: a "sheet class" consisting of buyers of corrugated sheets and a "box class" consisting of purchasers of corrugated containers. Linerboard II, 203 F.R.D. at 224. The Court's certification ruling was affirmed by the United States Court of Appeals for the Third Circuit and the Supreme Court denied certiorari. See Gaylord Container Corp. v. Garrett Paper, Inc., 538 U.S. 977, 123 S.Ct. 1786, 155 L.Ed.2d 666 (2003). All claims in the class case were resolved for a total of $202,572,489. By Order dat-

---

1. Linerboard includes any grade of paperboard suitable for use in the production of corrugated sheets, which are in turn used in the manufacture of corrugated boxes and for a variety of industrial and commercial applications. Corrugated sheets are made by gluing a fluted sheet which is not made of liner-

board, known as the corrugating medium, between facing sheets of linerboard; corrugated sheets are also referred to as containerboard. The defendants named in the instant lawsuits are major integrated manufacturers and sellers of linerboard, corrugated sheets, and corrugated boxes.

ed February 10, 2005, the Court approved initial distribution of over 90% the settlement fund to the classes; it approved a second distribution by Order dated June 28, 2005. By Order dated November 2, 2005, the Court approved a final distribution to all claimants.

## B. The Direct Actions

One-hundred and forty entities opted out of the classes certified by the Court by filing Requests for Exclusion on or before June 9, 2003, including FAC.[2] These 140 entities opted-out themselves and approximately 3400 subsidiary and affiliate companies.[3] Of the 140 Requests for Exclusion, thirteen groups of opt-outs subsequently filed direct actions against defendants al-

leging both federal and state claims. As of the date of this Memorandum, nine of those groups have outstanding claims against defendants Temple–Inland, Inc. and Gaylord Container Corp.[4] In the nine remaining actions, the claims against all other defendants have either been settled or withdrawn.

All of the remaining direct actions were originally filed in districts other than the Eastern District of Pennsylvania and were transferred to this Court for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407. On August 6, 2003, a conditional transfer order was issued by the Judicial Panel on Multidistrict Litigation pursuant to Rule 7.4 of the Rules of Procedure of that Panel. *Linerboard IV*, 292 F.Supp.2d

---

2. A copy of the Record of Potential Class Members Who Excluded Themselves from the Classes is appended to this Court's Memorandum and Order dated December 8, 2003 approving the Settlement Agreement between Temple–Inland, Inc. and Gaylord Container Corporation; this Court's Memorandum and Order dated December 8, 2003 granting Class Plaintiffs' Motion for Final Approval of Settlement Agreement Between the Class and International Paper Company and Union Camp Corporation, Georgia–Pacific Corporation, and Weyerhauser Company; and this Court's Memorandum and Order dated April 21, 2004 granting Class Plaintiffs' Motion for Final Approval of the Settlements with Defendants Packaging Corporation of America, Inc., Tenneco, Inc. and Tenneco Packaging Inc. and with Defendants Stone Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation.

3. In its Memorandum dated August 27, 2004, the Court directed each entity on whose behalf a Request for Exclusion was filed to affirm its intent to opt out by submitting a ratification form. By Order dated January 7, 2005, the Court dismissed with prejudice 803 entities which failed to submit ratification forms. The Court also dismissed without prejudice 635 entities and/or names of alleged predecessors-in-interest, trade names, and other entities/names which plaintiffs claim were not required to opt out.

4. The following are the direct actions that are proceeding:

1. *Perdue Farms Incorporated v. Stone Container Corporation, et al.*, No. 03–1702 (D. Md. filed June 9, 2003);

2. *Sara Lee Corporation, et al. v. Smurfit-Stone Container Corporation, et al.*, No. 03–3939 (N.D. Ill. filed June 10, 2003);

3. *The Procter & Gamble Company, et al. v. Stone Container Corporation, et al.*, No. 03–3944 (N.D. Ill. filed June 10, 2003);

4. *United States Gypsum Company, et al. v. Stone Container Corporation, et al.*, No. 03–4251 (N.D. Ill. filed June 10, 2003);

5. *Smithfield Foods, Inc., et al. v. Smurfit-Stone Container Corporation, et al.*, No. 03–3968 (N.D. Ill. filed June 11, 2003);

6. *Hormel Foods Corporation, et al. v. Stone Container Corporation, et al.*, No. 03–3421 (D. Minn. filed June 13, 2003);

7. *Milne Fruit Products, Inc., et al. v. Stone Container Corporation, et al.*, No. 03–4049 (N.D. Ill. filed June 13, 2003);

8. *Kellogg Company, et al. v. Smurfit Stone Container Corporation, et al.*, No. 03–4213 (N.D. Ill. filed June 19, 2003); and

9. *Mars Inc., et al. v. Stone Container Corporation, et al.*, No. 03–6977 (N.D. Ill. filed October 1, 2003).

at 652. That order, which became final on August 21, 2003, provided for the transfer to this Court of eight of the nine remaining direct actions. *Id.* The ninth direct action, *Mars Inc., et al. v. Stone Container Corporation, et al.,* No. 03–6977 (N.D. Ill. filed October 1, 2003), was transferred pursuant to a conditional transfer order dated December 8, 2003. That order became final on December 23, 2003.

## C. Direct Action Plaintiff FAC Acquisition, LLC

On June 9, 2003, FAC opted-out of the class action. Amended Notice of Request to be Excluded from the Linerboard Box and Sheet Classes at 4, Def. Ex. 1. On June 10, 2003, The Procter & Gamble Company, as lead plaintiff, and a number of other parties, including FAC, filed a direct action against all defendants. Procter & Gamble Compl. ¶ 28, Def. Ex. 2. The Complaint in this action has been amended twice. In the Second Amended Complaint, FAC alleges that it and "its subsidiaries, affiliates, predecessors-in-interest and assigns (collectively 'FAC'), purchased substantial quantities of corrugated material from one or more of the Defendants during the relevant period . . . . ." Procter & Gamble Second Amen. Compl. ¶ 30 (Document No. 58). FAC asserts a federal antitrust claim under Section 1 of the Sherman Act (15 U.S.C. § 1) and a state antitrust claim under Tennessee's antitrust statute, Tenn.Code Ann. §§ 47–25–101, 47–25–106.[5] Procter & Gamble Second Amen. Compl. ¶¶ 122–124, 163–168.

FAC has admitted that it did not purchase corrugated boxes or sheets from any of the defendants during the time period relevant to this litigation. Plaintiff FAC Acquisition LLC's Amended Individual Responses to Defendants' First Joint Set of Interrogatories (hereinafter "Amended Responses") at 2, Def. Ex. 3. Instead, FAC asserts antitrust claims on behalf of three companies—Fingerhut Companies, Inc., Fingerhut Corporation, and Tennessee Distribution, Inc. (collectively, "Fingerhut"). *Id.* at 4. FAC contends it is entitled to assert Fingerhut's claims based on its purchase of the operating assets of Fingerhut from Federated Department Stores ("Federated") in an Asset Purchase Agreement (the "Agreement") dated as of June 11, 2002. *Id.* at 4–5. Prior to the Agreement, Fingerhut was a wholly owned subsidiary of Federated, and Fingerhut Corp. and Tennessee Distribution, Inc. were wholly owned subsidiaries of Fingerhut. Agreement at 1 (Recital B), Def. Ex. 4; Plaintiff FAC Acquisition, LLC's Response to Defendants' Supplemental Set of Interrogatories (hereinafter "Supplemental Response") at 3, Def. Ex. 5. According to FAC, Fingerhut's claims arise out of purchases of corrugated containers or sheets by Fingerhut Corp. and Tennessee Distribution, Inc., between 1992 and 1998. Pl. Opp. at 1.

The Agreement contains several provisions pertinent to the Court's analysis. First, Recital C expresses the parties' intent as to the scope of the Agreement: "Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, certain of the assets of the Direct Marketing Business . . . ." [6] Agreement at 1. Next,

5. It should be noted that the Second Amended Complaint in the Procter & Gamble direct action includes allegations that defendants also violated the antitrust provisions of Colorado, Indiana, Kansas, South Carolina, and Wisconsin. Procter & Gamble Second Amen. Compl. ¶¶ 135, 142, 149, 156, 170. FAC, however, is not specifically listed as among those plaintiffs asserting claims under these other state provisions. *Id.* ¶¶ 137, 144, 151, 158, 172. Thus, FAC has only asserted claims under federal and Tennessee law.

6. Under the terms of the Agreement, the "Seller" is Fingerhut and the "Purchaser" is FAC. Agreement at 1.

Article 1 describes the "assets to be sold and retained." *Id.* Section 1.1, labeled "Acquired Assets," identifies nine categories of property to be conveyed. *Id.* at 1–2. The list does not include, specifically, the right to assert claims against third parties, a fact not disputed by FAC. Section 1.2 of the Agreement, entitled "Excluded Assets," describes the assets not transferred and explains that "Seller is not selling, conveying, transferring, delivering, or assigning to Purchaser, and Purchaser is not purchasing or acquiring from Seller, any assets or property of Seller other than the Acquired Assets, including, without limitation . . . ." *Id.* at 2. The two categories of enumerated "Excluded Assets" include "the equipment, other personal property and intellectual property used by Seller in connection with credit and collection activities" and "all tax refunds with respect to taxable years of Seller ending on or before the Closing Date." *Id.* at 3. The parties dispute whether the list of Excluded Assets is exhaustive.

Several other provisions in the Agreement are implicated by the Court's analysis. In Section 4.3 of the Agreement, Fingerhut represented that there was no litigation pending or threatened relating to the Acquired Assets. *Id.* at 5–6. Specifically, Fingerhut warranted that:

> Except for those items listed on *Schedule 4.3,* there are no suits, actions, governmental investigations, administrative hearings, arbitrations or other proceedings . . . pending or, to Seller's Knowledge, threatened, by or against or affecting Seller in connection with, or relating to, the Acquired Assets, the transactions contemplated by this Agreement or any action taken or to be taken in connection herewith or the consummation of the transactions contemplated hereby. . . .

*Id.* at 5 (emphasis in original). Section 10.4, entitled "Entire Agreement," explains that the "Agreement . . . supersede[s] any other agreements, whether written or oral, that may have been made or entered into by Purchaser and Seller or any of their Affiliates relating to the matters contemplated hereby." *Id.* at 22. This Section, in describing the "Entire Agreement," also references the schedules and exhibits attached to the Agreement as well as the "Confidentiality Agreement" and the "Purchase Letter Agreement." *Id.* Schedule 1.2, which lists Excluded Assets, is the only schedule or exhibit submitted or referenced by the parties. Finally, Section 10.10 states that the Agreement "is to be governed by, and construed and interpreted in accordance with, the laws of the State of Minnesota . . . ." *Id.* at 23.

In its responses to defendants' interrogatories, FAC contended that negotiations leading up to the execution of the Agreement and the terms of the Agreement itself "indicate that the parties to the Agreement intended that the presumably unknown and unasserted claims against the Defendants be included in the sale along with the other business assets." Supplemental Responses at 2. Thomas Petters ("Petters"), FAC's Chief Executive Officer, participated in the negotiations that led to the purchase of the assets of the Fingerhut Entities, and FAC contends his affidavit provides further support for this argument. Petters Aff. ¶¶ 1–2, Def. Ex. 7. According to Petters, "[a]lthough the subject [of antitrust claims] was not specifically discussed in negotiations, it was clear that FAC was buying . . . all of Fingerhut Companies, Inc.'s assets except those identified in paragraph 1.2 of the Agreement or on Schedule 1.2 attached thereto." *Id.* ¶ 6.

## III. *LEGAL STANDARD*

A court should grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "genuine" issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law." *Id.*

"In determining the facts, the court should draw all reasonable inferences in favor of the nonmoving party." *Id.* at 255, 106 S.Ct. 2505; *Highlands Ins. Co. v. Hobbs Group, LLC,* 373 F.3d 347, 351 (3d Cir.2004). The nonmoving party, however, cannot rely merely upon bare assertions, conclusory allegations, or suspicions to support a claim. *Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir.1982); *see also Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (stating that summary judgment must be granted if the evidence is "merely colorable" or "not significantly probative"). In a summary judgment motion, the moving party has the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. However, where the nonmoving party bears the burden of proof, it must "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.,* 812 F.2d 141, 144 (3d Cir. 1987) (citing *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548).

## IV. *DISCUSSION*

### A. The Parties' Arguments

Defendants make four principal arguments in support of their Motion for Summary Judgment. First, they contend that, because FAC has admitted that the right to assert the claims of Fingerhut was not specifically included in Section 1.1 ("Acquired Assets") of the Agreement, FAC never acquired the right to assert Fingerhut's antitrust claims under the Agreement. Second, although third-party claims were not specifically listed under Section 1.2 ("Excluded Assets"), the claims were not transferred under the Agreement because the plain language of the Agreement states that FAC acquired only those assets expressly mentioned in Section 1.1. Third, under Minnesota law, the Court should not speculate about the unexpressed intentions of the parties when the plain meaning of a contract is unambiguous, and FAC should not be allowed to use parol evidence to create ambiguity in an otherwise unambiguous contract. Fourth, assuming *arguendo* that the parties to the Agreement intended to transfer Fingerhut's claims, FAC has not acquired the right to assert Fingerhut's antitrust claims because Third Circuit law requires that such an assignment be made in express terms.

FAC responds with three arguments in support of its contention that it acquired the right to assert Fingerhut's claims. First, Fingerhut did not intend to retain its rights in the antitrust litigation because these rights were not included in the Schedule of Excluded Assets and because Fingerhut made representations in Section 4.3 of the Agreement that there was no litigation pending or threatened relating to the sale. Second, under Minnesota law, parties to the sale of substantially all of the seller's business assets may be found to have intended to include unknown claims arising out of the seller's operations, even if such claims were not expressly transferred under the terms of the agreement. Third, the Schedule of Excluded Assets creates ambiguity in the plain meaning of the contract—because if

it was not meant to be an exhaustive list, it serves no real purpose—and, therefore, under Minnesota law, the Court should look to the intention of the parties to interpret the terms of the ambiguous contract.

### B. Assignment of Antitrust Claims

 FAC has asserted antitrust claims under both federal and Tennessee law. The question of assignment of a federal antitrust claim is governed by federal common law under the rule announced in *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425 (3d Cir.1993) (*"Gulfstream"*). The question of assignment of a Tennessee antitrust claim is purely a matter of contract construction. In this case, Minnesota law governs that analysis, because it is the law applicable to construction of the Agreement. Due to the different standards governing the assignment of claims arising under the two relevant statutes, the Court must engage in a two-part analysis to determine whether FAC has standing to assert Fingerhut's claims. As explained below, because *Gulfstream* requires that assignments of federal antitrust claims be made in express terms and because the Agreement does not contain such an express term, FAC lacks standing to assert Fingerhut's federal antitrust claim. With respect to FAC's state law claim, the Court concludes that the Agreement, which is an unambiguous, integrated writing, does not include the assignment of antitrust claims because they were not specifically included in the list of assets acquired by FAC.

### C. FAC's Federal Antitrust Claim

#### 1. *Gulfstream and its Progeny*

 In analyzing questions of federal law, the Court applies the law of the transferee court and is bound by Third Circuit precedent. *Linerboard VIII*, 2005 WL 1625040, at *4 ("[A]lthough the law of the transferor court merits consideration, only the law of the transferee court is binding on issues of federal law in an action transferred pursuant to 28 U.S.C. § 1407."). Thus, the Court begins its analysis with a discussion of the Third Circuit's opinion in *Gulfstream*. In that case, Gulfstream III brought suit against seven manufacturers of business jet aircraft, alleging a horizontal price-fixing conspiracy. *Gulfstream*, 995 F.2d at 428. Defendant Cessna Aircraft Company ("Cessna"), the only defendant not to settle, challenged Gulfstream III's standing to assert federal antitrust claims. *Id.* Cessna argued that Gulfstream III assigned the rights to these claims to another entity, JB & A, based on its assignment of the purchase agreement for an airplane, the alleged price-fixed item. *Id.* at 437. The *Gulfstream* Court disagreed with Cessna.

The Third Circuit in *Gulfstream* first explained that the validity of the assignment of an antitrust claim "is a matter of federal common law." *Id.* (citing *In re Fine Paper Litig.*, 632 F.2d 1081, 1090 (3d Cir.1980) ("In any event, the status of assignments under the Sherman and Clayton Acts is a matter of federal law.")). The Court then turned to the question of whether, under federal common law, a general assignment of "rights, title and interest" was sufficient to validly assign a federal antitrust claim, and it answered in the negative. *Id.* at 438. Next, the Court explained that "a general assignment would be disfavored under the direct purchaser rule" because of the speculation required to determine "the relative extent of injury incurred by the direct or remote purchasers ...." *Id.* at 439. The Third Circuit concluded that "any assignment of antitrust claims, as a matter of federal common law, must be an express assignment; general assignments, without specific reference to antitrust claims, cannot validly transfer the right to pursue those claims." *Id.* at 440.

Shortly after *Gulfstream* was decided, the Third Circuit interpreted *Gulfstream* and concluded that an unambiguous and all-inclusive assignment of claims was sufficient to meet the express assignment standard. *See Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106 (3d Cir.1993).[7] In *Lerman*, Joyce International, Inc. ("Joyce International") purchased an unincorporated division of Litton Selling Entities ("Litton"). *Id.* at 107–108. The purchase agreement provided that the assets acquired by Joyce International included "without limitation, any and all of the following: ... causes of action, judgments, claims and demands of whatsoever nature." *Id.* at 108. After Lerman filed suit, Joyce International asserted several counterclaims, including one alleging violation of the Racketeering Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1961, *et. seq. Lerman*, 10 F.3d at 108. In opposition, Lerman argued that Litton had not validly assigned the RICO claim to Joyce International.[8] *Id.* at 111. The Third Circuit disagreed and concluded that the "language is unambiguous and all-inclusive. Consequently, we hold that this assignment is 'express' within the meaning of *Gulfstream.*" *Id.* at 112.

*Lerman* interpreted *Gulfstream* in two significant respects. First, the *Lerman* Court held that an unambiguous and all-inclusive assignment of claims, even without specifying the types of causes of action assigned, satisfies the express assignment requirement. Second, the decision confirmed that the rule announced in *Gulf-*stream was not limited to assignments arising out of purchase agreements for an allegedly price fixed product. While *Gulfstream* analyzed a purchase agreement for the product at issue in the antitrust litigation (an airplane), *Lerman* involved a purchase agreement for a division of a corporation. The analysis in *Lerman* makes it clear that the rule in *Gulfstream* is applicable to the type of agreement at issue in the instant case—an agreement to purchase corporate assets.

2. *Application of Federal Common Law*

■ After reviewing the evidence presented and the arguments asserted by the parties, the Court concludes that the Agreement between FAC, Federated, and Fingerhut did not expressly assign the federal antitrust claim asserted by FAC. The terms of the Agreement explain that only those assets listed as "Acquired Assets" were transferred to FAC, and the enumerated list in Section 1.1 makes no mention of an assignment of antitrust rights, causes of action, or claims. Additionally, Section 1.1 is devoid of any unambiguous, catch-all provision assigning claims, such as the one at issue in *Lerman*. Therefore, under *Gulfstream* and its interpretation in *Lerman*, the Court concludes FAC does not have standing to assert Fingerhut's federal antitrust claim.

Moreover, the rule announced in *Gulfstream* precludes the Court from accepting FAC's arguments. First, FAC contends

---

**7.** While the claim at issue in *Lerman v. Joyce Internat'l, Inc.* was asserted pursuant to the Racketeering Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1961, *et. seq.*, the Third Circuit concluded that *Gulfstream* was applicable to its analysis. *Lerman*, 10 F.3d 106, 112 (3d Cir.1993). In *Gulfstream*, "we held that an assignment of a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, must be 'express.' Since this provision served as the model for the provi-sion of the RICO statute authorizing private civil actions, 18 U.S.C. § 1964, we assume that an assignment of a RICO claim must also be 'express.'" *Lerman*, 10 F.3d at 112.

**8.** The question of assignment was at issue because most of the events relevant to the RICO claim occurred prior to Joyce International's acquisition of the unincorporated division. *Lerman*, 10 F.3d at 111.

that the antitrust claims (both federal and state) were impliedly transferred, because only those assets specifically excluded in Section 1.2 were not transferred under the Agreement. As explained in greater detail below (Part IV.D, *infra*), FAC's argument is contrary to the plain meaning of the Agreement and, more importantly, unavailing under federal common law which requires that the assignment be made expressly. Second, FAC argues that an affidavit from Petters supports its contention that the parties intended to transfer the antitrust claims. As explained below (Part IV.E, *infra*), Petters's affidavit is parol evidence and will not be considered by the Court because the Agreement is an unambiguous, integrated writing.

For all of the foregoing reasons, the Court concludes that, under the terms of the Agreement, Fingerhut did not assign its federal antitrust claim to FAC.[9]

### D. FAC's State Antitrust Claim

■ While federal common law governs the assignment of federal antitrust claims, the assignment of state law claims is determined by the applicable state law. *See, e.g., Silver v. Klehr, Harrison, Harvey, Branzburg & Ellers, LLP,* 2004 WL 1699269 (E.D.Pa. July 28, 2004) (applying Pennsylvania law in analyzing assignment of legal malpractice claim). The Court's determination of FAC's standing to assert Fingerhut's claim under Tennessee's antitrust statute is based on its interpretation of the Agreement. Because the Agreement contains a choice of law provision which requires that it be construed under Minnesota law, the Court will analyze the Agreement based on Minnesota's rules of contract construction. *See, e.g., Jiffy Lube*

*Int'l, Inc. v. Jiffy Lube of Pennsylvania, Inc.,* 848 F.Supp. 569 (E.D.Pa.1994) (holding that choice of law provision governed construction and interpretation of agreement). In turning to Minnesota law to analyze the assignment of Fingerhut's state antitrust claim, the Court notes that the parties have not pointed to any special rule under Tennessee law that relates to the assignment of Tennessee antitrust claims, and the Court has found none.

#### 1. *Minnesota Law*

■ Under Minnesota law, the primary goal of contract interpretation is to determine and enforce the intent of the parties. *Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn.1979) (citing *Midway Center Associates v. Midway Center, Inc.,* 306 Minn. 352, 237 N.W.2d 76 (1975)). To do so, the Court must turn to the language of the contract at issue—the Agreement of July 11, 2002. "When the parties express their intent in unambiguous words, those words are to be given their plain and ordinary meaning." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.,* 666 N.W.2d 320, 323 (Minn. 2003) ("*Motorsports II*") (citing *Minneapolis Pub. Hous. Auth. v. Lor,* 591 N.W.2d 700, 704 (Minn.1999)). The Court must decide whether the terms of the Agreement are ambiguous. *3M Innovative Properties Co. v. Barton Nelson, Inc.,* 2003 WL 22989077, at *3 (D.Minn. Dec.12, 2003) (applying Minnesota law) ("Whether the terms of a contract are ambiguous is a question of law, which must be determined based on contract language itself.").

---

9. During the status conference on November 21, 2005, the Court asked whether, assuming the Court ruled that the antitrust claims were not assigned to FAC, Federated could assert those claims on behalf of Fingerhut. Barack S. Echols, Esq., counsel for defendant Weyer-

haeuser Paper Co., responded that "to the extent that anyone other than FAC or a currently proceeding opt-out plaintiff has the claim, then that claim has been settled at the least." Telephone Conference Transcript, November 21, 2005, at 5:21–24.

### 2. Analysis of the Agreement under Minnesota Law

 The Court concludes that the pertinent terms of the Agreement are unambiguous and that Fingerhut did not transfer its rights to the antitrust claims to FAC. Recital C clearly states that the scope of the transfer is limited and that Federated, Fingerhut, and FAC intended the transfer of only "*certain* of the assets of the Direct Marketing Business...." Agreement at 1 (emphasis added). Section 1.1, entitled "Acquired Assets," describes nine categories of assets transferred under the Agreement; none of these categories include claims or causes of action. *Id.* at 1–2. Additionally, Section 1.2 explains that "Seller is not selling, conveying, transferring, delivering, or assigning to Purchaser, and Purchaser is not purchasing or acquiring from Seller, *any assets or properties of Seller other than the Acquired Assets ....*" *Id.* at 2 (emphasis added). These three provisions—Recital C, Section 1.1, and Section 1.2—make clear that only those assets listed in Section 1.1 were transferred under the Agreement, and the antitrust claims belonging to Fingerhut were not included in that exhaustive list.

 FAC contends that the terms of the Agreement are ambiguous due to the presence of an exhaustive list of Excluded Assets in Section 1.2. The Court does not agree. It is clear that the list of Excluded Assets is illustrative and not exhaustive because it is prefaced by the phrase "including, without limitation...." *Id.* The plain meaning of that phrase is "to contain as part of something" or "indicates a partial list." Black's Law Dictionary 766 (7th ed.1999). Thus, the terms of the contract preclude the conclusion that the list of Excluded Assets is exhaustive. Moreover, the presence of the list of Excluded Assets in Section 1.2 does not create ambiguity in the relevant terms of the Agreement.

Such a list serves to highlight specific assets that were not part of the Acquired Assets; under the express language of the Agreement, the list of Excluded Assets cannot be used to limit assets not assigned. Therefore, the Court concludes that, under the unambiguous terms of the Agreement, Fingerhut did not transfer its state antitrust claim to FAC.

### E. FAC's Other Arguments

In arguing that Fingerhut intended to transfer its federal and state antitrust claims, FAC points to Section 4.3 of the Agreement and Petters's affidavit. The Court rejects both arguments.

 Section 4.3 is Fingerhut's warranty that there was no litigation pending or threatened relating to the Acquired Assets. This provision has no bearing on the question of whether Fingerhut assigned its antitrust claims to FAC. Section 4.3 relates to potential litigation pertaining to the assets transferred and not, as FAC asserts, whether any of the assets transferred include potential claims or causes of action.

 With respect to Petters's affidavit, the Court notes that, according to Petters, the intent of the parties was to transfer all of Fingerhut's assets except for those specifically excluded by Section 1.2 of the Agreement. Petters Aff. ¶¶ 4–6. The Court, however, has already concluded that the terms of the Agreement are unambiguous and that only those assets *included* in the list of Acquired Assets were transferred to FAC. Thus, Petters's statement is contradicted by the plain language of the Agreement. In addition, as explained below, because the statements in Mr. Petters's affidavit are parol evidence and because Minnesota law prohibits consideration of parol evidence offered by a party to contradict the terms of an unambiguous, integrated writing, the Court will

not consider Mr. Petters's affidavit in deciding the instant motion. *See Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 312 (Minn. 2003).[10]

■■■ Parol evidence is "extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements...." *Id.* The statements in Petters's affidavit qualify as parol evidence because they pertain to representations made during the negotiations that led to the execution of the Agreement. *See Mies Equipment, Inc. v. NCI Bldg. Systems, L.P.*, 167 F.Supp.2d 1077, 1082–83 (D.Minn.2001) ("the terms of a final and integrated written expression may not be contradicted by parol evidence of previous understandings and negotiations ....").

■■■ In determining whether the Agreement is a complete integration of the terms of the contract between FAC, Federated, and Fingerhut, the Court looks to the writing itself and then reads the writing "in light of the situation of the parties, the subject matter and purposes of the transaction, and like attendant circumstances." *Bussard v. Coll. of St. Thomas, Inc.*, 294 Minn. 215, 200 N.W.2d 155, 161 (1972) (citations omitted). The Minnesota Supreme Court has stated that "[a] merger clause establishes that the parties intended the writing to be an integration of their agreement." *Alpha Real Estate*, 664 N.W.2d at 312 (citing Williston on Contracts § 33.21 (4th ed.1999)). Section 10.4 of the Agreement states that "[t]his Agreement ... supersede[s] any other agreements, whether written or oral, that may have been made or entered into by Pur-

chaser and Seller or any of their Affiliates relating to the matters contemplated hereby." Agreement at 22. Because Section 10.4 qualifies as a merger clause, the Agreement, under Minnesota law, is a complete integration of the contract between the parties. Thus, the parol evidence offered by FAC cannot be considered by the Court and does not create a genuine issue of material fact regarding the transfer of the Fingerhut claims.

FAC's final argument is that, under Minnesota law, "parties to the sale of substantially all of the seller's business assets may be found to have intended to include an unknown claim arising out of seller's operation, even though not mentioned in the sale documents." Pl. Opp. at 3. In its brief, FAC argues that Minnesota law presumes that such a sale includes unknown legal claims: "[w]hen a business sells substantially all of its assets without expressly reserving potential claims, there is a presumption that the seller did not intend to exclude such claims from the sale." Pl. Opp. at 4. FAC points to *In re Milk Products Antitrust Litig.*, 195 F.3d 430 (8th Cir.1999) (applying Minnesota law) and *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.* ("*Motorsports I*"), 653 N.W.2d 204 (Minn.Ct.App.2002).

The Court does not agree with FAC's interpretation of Minnesota law. The Minnesota Supreme Court has stated that *Milk Products* has little precedential value. "[A]lthough *Milk Products* purports to apply Minnesota law, it actually does so at the most general level: it only affirms the primacy of the intent of the parties as the basis for contract interpretation."

---

**10.** Under Minnesota law, "when parties reduce their agreement to writing, parol evidence is ordinarily inadmissible to vary, contradict, or alter the written agreement." *Hruska v. Chandler Assoc's, Inc.*, 372 N.W.2d 709, 713 (Minn.1985). According to the Minnesota Supreme Court, parol evidence

may be relied upon when the written agreement is ambiguous or "[i]f it appears from the circumstances of the case that the parties did not intend the agreement to be a complete integration." *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 312 (Minn.2003).

*Motorsports II,* 666 N.W.2d at 325. While the Eighth Circuit's decision in *Milk Products* appears to be on point to the extent that it examines whether a plaintiff's antitrust claims were transferred as part of a sale of assets, the Minnesota Supreme Court has noted that the posture of the case limits its precedential value in cases such as the instant one. *"Milk Products* arose in the unusual context of the adequacy of the plaintiff to represent the class, and therefore the court's decision on standing is somewhat diluted by being blended with class action criteria." *Motorsports II,* 666 N.W.2d at 325. Given the Minnesota Supreme Court's efforts in *Motorsports II* to distinguish the Eighth Circuit's analysis in *Milk Products,* the Court concludes that FAC's argument to apply the holding of *Milk Products* is unjustified and, therefore, unpersuasive in disposing of the instant motion for summary judgment.

In *Motorsports I,* the second case relied upon by FAC, the Minnesota Court of Appeals interpreted the meaning of the term "intangibles" in a purchase agreement and found it to include potential antitrust claims. 653 N.W.2d at 207. The Agreement in the instant case does not contain any analogous terms for interpretation. For that reason alone, *Motorsports I* is inapplicable to this case. Additionally, the Minnesota Supreme Court reversed the Court of Appeals on the issue of assignment of the antitrust claims. *Motorsports II,* 666 N.W.2d at 327. Although FAC claims that the "Minnesota Supreme Court reversed *Motorsports I* based on factual distinctions inapplicable to [this] case," the Court concludes that the reversal in *Motorsports II* negates any potential

precedential value that *Motorsports I* might have in this case.

## V. CONCLUSION

Based on the foregoing analysis, the Court determines that the relevant terms of the Agreement are unambiguous, that the Agreement is an integrated writing, and that Fingerhut's federal and state antitrust claims were not assigned to FAC. Because these antitrust claims were not assigned, FAC lacks standing to assert these claims in this litigation. Therefore, Defendants' Motion for Summary Judgment Directed to Plaintiff FAC Acquisition, LLC is granted.

An appropriate Order follows.

### ORDER

**AND NOW,** this 28th day of July, 2006, upon consideration of Defendants' Motion for Summary Judgment Directed to Plaintiff FAC Acquisition, LLC (Document No. 85, filed October 17, 2005), Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment Directed to Plaintiff FAC Acquisition, LLC (Document No. 86, filed November 7, 2005), Defendants' Reply Brief in Support of Defendants' Motion for Summary Judgment against Plaintiff FAC Acquisition, LLC (Document No. 87, filed November 14, 2005), and the related submissions of the parties,[1] and good cause appearing, **IT IS ORDERED** that Defendants' Motion for Summary Judgment Directed to Plaintiff FAC Acquisition, LLC is **GRANTED.**

---

1. Counsel for defendants and plaintiff FAC Acquisition, LLC submitted letters to the Court following a telephone status conference on November 21, 2005—a letter dated December 8, 2005 on behalf of defendants and a letter dated December 12, 2005 on behalf of FAC Acquisition, LLC.